**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MDK CORPORATION and C&J REALTY, L.P., | ) | FILED: JULY 30, 2008 |
| | ) | 08CV4336 |
| Plaintiffs, | ) | JUDGE LEINENWEBER |
| | ) | MAGISTRATE JUDGE NOLAN |
| v. | ) | No: |
| | ) | JFB |
| 7-ELEVEN, INC., | ) | **JURY DEMANDED** |
| f/k/a SOUTHLAND CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

**INTRODUCTION**

1.      In 1997, Plaintiffs contracted with Defendant to sell and lease a number of properties in Indiana on which convenience stores and gas stations were operated.  Under the terms of the agreement between the parties, Defendant agreed to act as Plaintiffs' agent to oversee the cleanup and remediation that often occurs with ownership of gasoline stations – such as gasoline storage tank leaks, line leaks, and other gasoline spills. Pursuant to the agreement between the parties, and acting as Plaintiffs' agent, Defendant also agreed to seek authorization for reimbursements with the Indiana Department of Environmental Management ("IDEM"), to be paid by the Indiana Excess Liability Trust Fund ("ELTF").

2.      Defendant failed to carry out its contractual and fiduciary duties owed to Plaintiffs.  In this Complaint, Plaintiffs sets forth numerous instances in which Defendant breached its agreement with Plaintiffs and breached its fiduciary duty as Plaintiffs' agent in carrying out its duties in seeking reimbursement for remediation work on the transferred properties, damaging Plaintiffs in excess of $2,000,000, to be proven at trial.

**JURISDICTION**

3.     MDK Corporation ("MDK") is an Indiana corporation with an address of 415 New Street, P.O. Box 96, Goshen, Indiana 46529-0096.  MDK engages in the business of running convenience stores in northern Indiana.

4.     C&J Realty, L.P. ("C&J Realty") is an Indiana limited partnership with an address of 415 New Street, P.O. Box 96, Goshen, Indiana 46529-0096. C&J Realty is in the business of buying and leasing real property.

5.     7-Eleven, Inc., f/k/a The Southland Corporation ("7-Eleven"), is a Texas corporation with an address of 2711 North Haskell Avenue, Dallas, Texas 75204. 7-Eleven is primarily engaged in the business of running convenience stores throughout the United States, including Illinois.

6.     In or about May, 1997, 7-Eleven expressed an interest in purchasing or leasing a group of properties (the "Properties") from MDK and C&J Realty (collectively referred to as "MDK" or "Plaintiffs") to operate convenience stores.

7.     On or about December 24, 1997, MDK, as seller, entered into a Purchase and Sale Agreement (the "Agreement") with 7-Eleven, as purchaser, whereby 7-Eleven agreed, subject to certain conditions, to either purchase or lease certain properties (the "Properties") from MDK.  A copy of the Agreement (without attachments) is attached hereto and incorporated herein as Exhibit A.

8.     Pursuant to Section 12.12 of the Agreement, disputes pertaining to the Agreement are to be brought in Cook County, Illinois. Section 12.12 of the Agreement specifically states, in part:

> This Agreement shall be interpreted, construed and enforced, and all
> questions concerning compliance by any person with its terms shall be
> determined, in accordance with the laws of the State of Illinois, without

giving effect to the choice of law principles and any court of competent
jurisdiction sitting in Cook County, Illinois shall have exclusive
jurisdiction and venue over any dispute relating to or arising out of this
Agreement or the performance or nonperformance of any obligation under
this Agreement.

9.      This Court has diversity jurisdiction over the parties pursuant to 28 U.S.C.

§1332, since the parties are citizens of different states and the amount in controversy,

exclusive of interest and costs, exceeds $75,000.

10.     Venue is proper pursuant to 28 U.S.C. §1391(a), since 7-Eleven resides in

this judicial district.

**FACTS RELEVANT TO ALL COUNTS**

11.     Pursuant to Section 10.4(a) of the Agreement, 7-Eleven agreed to act as

MDK's agent for purposes of overseeing "Remedial Measures" at the Properties.

Remedial Measures are defined in Section 10.4(a) of the Agreement as:

> [T]hose activities, in Purchaser's reasonable opinion, which are required
> to investigate and/or assess and remediate petroleum and petroleum
> hydrocarbon conditions existing on or beneath, or migrating from or onto,
> the Properties in order to comply with all applicable Legal Requirements
> and all schedules, approvals and requirements of the Department and shall
> include any ongoing investigations and/or assessments, treatment or
> monitoring currently being conducted by [MDK] on any of the Properties.

12.     Under the Agreement, 7-Eleven would not itself perform the Remedial

Measures, but rather would select an environmental consultant to do the work.

Agreement, Section 10.4(a).  7-Eleven, in its sole discretion, made the decision to hire

ENSR as its environmental consultant.  MDK was not allowed any input into the decision

to use ENSR to perform the Remedial Measures under the Agreement.

13.     Pursuant to the Agreement, 7-Eleven, in consultation with MDK, would

"determine the manner, means and extent of performance of the Remedial Measures."

Agreement, Section 10.4(a).  Nonetheless, 7-Eleven never did consult with MDK about whether any Remedial Measures were appropriate or necessary, or whether the Remedial Measures were subject to reimbursement pursuant to IDEM's well-known, published guidelines and regulations.  In fact, despite repeated and continual attempts by MDK since 2000 to have input into the Remedial Measures and the reimbursement process, via letter and face to face meetings, 7-Eleven refused to consult or cooperate with MDK and has refused to address the breaches detailed herein.

14.     Under the Agreement, ENSR, as 7-Eleven's consultant, performed the Remedial Measures and billed 7-Eleven directly.  7-Eleven, pursuant to the Agreement, is obligated to initially pay ENSR directly for its services.  Agreement, Section 10.4(b).

15.     Thereafter, 7-Eleven, under the terms of the Agreement, was required "to cause [ENSR] to make timely application [to IDEM] for reimbursement of costs incurred in connection with the performance of the Remedial Measures."  Agreement, Section 10.4(c).  MDK is responsible to pay any amounts not reimbursed by the ELTF, but for 7-Eleven's unreasonableness, gross negligence or willful misconduct.  Agreement, Section 10.4(a), (c).

16.     IDEM has long-established, published billing requirements that must be adhered to before it will authorize reimbursements for Remedial Measures from the ELFT, including but not limited to inclusion of documentation supporting the work done, billing at specified rates and at specified amounts for certain work, and getting prior approval to perform certain work.

17.     Under Section 10.4 of the Agreement, 7-Eleven attempted to limit its contractual responsibility for its actions except for its gross negligence or willful misconduct:

4

> [7-Eleven] shall have no responsibility or liability for amounts not reimbursed by the Department…unless [MDK] can demonstrate gross negligence or willful misconduct on the part of 7-Eleven.

18.    Nonetheless, 7-Eleven's actions, as demonstrated below, were unreasonable, grossly negligent and amount to willful misconduct.

19.    Pursuant to the explicit terms of the Agreement, 7-Eleven agreed to act as MDK's agent with respect to Remedial Measures and reimbursements relating thereto. Section 10.4(a) of the Agreement states, in pertinent part: "Seller [MDK], as the responsible party in connection with any remediation, designates Purchaser [7-Eleven] as its agent for purposes of overseeing the Remedial Measures."

20.    Section 10.4(a) of the Agreement also states: "As agent/designee of Seller [MDK], Purchaser [7-Eleven], in consultation with Seller [MDK], …shall determine the manner, means and extent of performance of the Remedial Measures."

21.    Under Section 10.4(c) of the Agreement, 7-Eleven is also designated as MDK's agent "for purposes of providing additional information or responding to inquiries by [IDEM]."

22.    During the relevant time period, 7-Eleven has failed to obtain reimbursement for a large portion of the Remedial Measures from IDEM due to its unreasonableness, gross negligence, willful misconduct and breach of fiduciary duties, and, in addition, has charged interest to MDK that would not have accrued but for 7-Eleven and its agent's unreasonableness, gross negligence and/or willful misconduct and breach of fiduciary duties.

**COUNT I – BREACH OF CONTRACT  –
FAILURE TO SUBMIT INVOICES TO IDEM FOR REIMBURSEMENT**

23.    MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count I.

24.    MDK has fully performed each and every one of its obligations under the Agreement.

25.    7-Eleven, in contrast, has repeatedly breached numerous aspects of the Agreement.  In particular, despite controlling the Remedial Measures and submission of reimbursements to IDEM pursuant to Section 10.4(c) of the Agreement, 7-Eleven and its agent, ENSR, failed to submit certain invoices for Remedial Measures to IDEM for authorization of payment.

26.    7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

27.    7-Eleven has breached its duty of good faith and fair dealing by failing to submit invoices for reimbursement.

28.    7-Eleven's actions caused damage to MDK in excess of $275,000, to be proven at trial.

**COUNT II – BREACH OF FIDUCIARY DUTY –
FAILURE TO SUBMIT INVOICES TO IDEM FOR REIMBURSEMENT**

29.    MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count II.

30.    As agent for MDK, 7-Eleven had a duty of care and a duty of loyalty.

31.    7-Eleven repeatedly breached those duties by, inter alia, the actions set forth in Paragraphs 23-28 above.

32.    As a proximate result of 7-Eleven's breach of fiduciary duty, MDK has been damaged in excess of $275,000, to be proven at trial.

**COUNT III – BREACH OF CONTRACT –**
**CHARGING MDK MORE THAN THE AMOUNTS SUBMITTED IN INVOICES**
**TO IDEM FOR REIMBURSEMENT**

33.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count III.

34.     MDK has fully performed each and every one of its obligations under the Agreement.

35.     7-Eleven, in contrast, has repeatedly breached numerous aspects of the Agreement.  Even for those invoices that 7-Eleven did cause to be submitted to IDEM, 7-Eleven's corresponding invoices charged to MDK secretly included additional charges for Remedial Measures that were never submitted to IDEM, as required pursuant to Section 10.4(c) of the Agreement.

36.     7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

37.     7-Eleven has breached its duty of good faith and fair dealing by failing to submit invoices for reimbursement.

38.     7-Eleven's actions caused damage to MDK in excess of $250,000, to be proven at trial.

**COUNT IV – BREACH OF FIDUCIARY DUTY –**
**CHARGING MDK MORE THAN THE AMOUNTS SUBMITTED IN INVOICES**
**TO IDEM FOR REIMBURSEMENT**

39.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count IV.

40.     As agent for MDK, 7-Eleven had a duty of care and a duty of loyalty.

41.     7-Eleven repeatedly breached those duties by, inter alia, the actions set forth in Paragraph 33-38 above.

7

42.     As a proximate result of 7-Eleven's breach of fiduciary duty, MDK has been damaged in excess of $250,000, to be proven at trial.

## COUNT V – BREACH OF CONTRACT –
### FAILURE TO TIMELY SUBMIT INVOICES TO IDEM FOR REIMBURSEMENT

43.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count V.

44.     MDK has fully performed each and every one of its obligations under the Agreement.

45.     7-Eleven, in contrast, has repeatedly breached numerous aspects of the Agreement.  Pursuant to Section 10.4(c) of the Agreement, 7-Eleven agreed to cause timely application to IDEM and the ELTF for payment and reimbursement of Remedial Measures.  Nonetheless, 7-Eleven repeatedly failed to make timely application for payment and reimbursement of expenses, at times waiting more than a year prior to submitting the invoice.

46.     7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

47.     7-Eleven has breached its duty of good faith and fair dealing by failing to submit invoices for reimbursement.

48.     7-Eleven's actions caused damage to MDK in excess of $100,000, to be proven at trial.

## COUNT VI – BREACH OF FIDUCIARY DUTY –
### FAILURE TO TIMELY SUBMIT INVOICES TO IDEM FOR REIMBURSEMENT

49.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count VI.

50.     As agent for MDK, 7-Eleven had a duty of care and a duty of loyalty.

51.    7-Eleven repeatedly breached those duties by, inter alia, the actions set forth in Paragraph 43-48 above.

52.    As a proximate result of 7-Eleven's breach of fiduciary duty, MDK has been damaged in excess of $100,000, to be proven at trial.

## COUNT VII – BREACH OF CONTRACT –
## FAILURE TO SUBMIT REQUIRED DOCUMENTATION TO IDEM TO
## SUPPORT REQUESTS FOR REIMBURSEMENT

53.    MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count VII.

54.    MDK has fully performed each and every one of its obligations under the Agreement.

55.    7-Eleven, in contrast, has repeatedly breached numerous aspects of the Agreement.  With regard to numerous invoices, IDEM has continually refused to reimburse MDK because of 7-Eleven's incomplete submittals lacking proper documentation to support the Remedial Measures.  With regard to all the Properties, IDEM has denied reimbursement requests for Remedial Measures in excess of $300,000 due to 7-Eleven's failure to submit proper documentation, as required pursuant to Section 10.4(c) of the Agreement.

56.    7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

57.    7-Eleven has breached its duty of good faith and fair dealing by failing to submit invoices for reimbursement.

58.    7-Eleven's actions caused damage to MDK in excess of $300,000, to be proven at trial.

## COUNT VIII – BREACH OF FIDUCIARY DUTY –
## FAILURE TO SUBMIT REQUIRED DOCUMENTATION TO IDEM TO
## SUPPORT REQUESTS FOR REIMBURSEMENT

59.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count VIII.

60.     As agent for MDK, 7-Eleven had a duty of care and a duty of loyalty.

61.     7-Eleven repeatedly breached those duties by, inter alia, the actions set forth in Paragraph 53-58 above.

62.     As a proximate result of 7-Eleven's breach of fiduciary duty, MDK has been damaged in excess of $300,000, to be proven at trial.

## COUNT IX – BREACH OF CONTRACT  –
## UNREASONABLE, EXCESSIVE COSTS

63.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count IX.

64.     MDK has fully performed each and every one of its obligations under the Agreement.

65.     7-Eleven, in contrast, has repeatedly breached numerous aspects of the Agreement, including but not limited to Section 10.4(c) of the Agreement.  It is standard industry practice in Indiana for environmental remediation companies *not* to charge in excess of IDEM's well-known and published rates and costs.  However, because 7-Eleven knowingly disregarded IDEM's requirements, IDEM has also refused to reimburse MDK for these unreasonable, excessive labor costs and other unreasonable, excessive charges by 7-Eleven and its agent, ENSR, in performing the Remedial Measures.  These unreasonable charges have caused IDEM to refuse to reimburse more than $200,000 in costs for Remedial Measures.

10

66.     In addition, IDEM will not compensate for time incurred relating to the submittal of Remedial Expense invoices.  Despite this knowledge, and the standard industry practice in Indiana for environmental remediation companies *not* to charge its principles any fees  relating to the submission of remediation invoices to IDEM, 7-Eleven has charged MDK more than $450,000 to date for unreimbursed charges incurred by 7-Eleven to submit invoices to IDEM for authorization for payment.

67.     As discussed above, many times, when 7-Eleven did submit invoices for reimbursement to IDEM, that reimbursement request was denied due to 7-Eleven's failure to submit proper documentation, or for charging labor costs well in excess of IDEM's well-known and published allowable rates.  While attempting to correct its own gross negligence by resubmitting the invoice, *e.g*., with documentation it was required to submit in the first place, 7-Eleven further damaged MDK by charging it more than $28,000 to correct 7-Eleven's own prior gross negligence.  This practice, too, is out of line with standard industry practice.

68.     7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

69.     7-Eleven has breached its duty of good faith and fair dealing by failing to submit invoices for reimbursement.

70.     7-Eleven's actions caused damage to MDK in excess of $675,000, to be proven at trial.

### COUNT X – BREACH OF FIDUCIARY DUTY – UNREASONABLE, EXCESSIVE COSTS

71.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count X.

11

72.    As agent for MDK, 7-Eleven had a duty of care and a duty of loyalty.

73.    7-Eleven repeatedly breached those duties by, inter alia, the actions set forth in Paragraphs 63-70 above.

74.    As a proximate result of 7-Eleven's breach of fiduciary duty, MDK has been damaged in excess of $675,000, to be proven at trial.

## COUNT XI – BREACH OF CONTRACT –
## POST-CLOSING RELEASES

75.    MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count XI.

76.    MDK has fully performed each and every one of its obligations under the Agreement.

77.    7-Eleven, in contrast, has repeatedly breached numerous aspects of the Agreement.  Pursuant to Sections 10.7 and 11.3 of the Agreement, 7-Eleven has sole responsibility for any "Post Closing Releases" – those releases which occurred after May 1998, the closing date for the Agreement.  If a Post-Closing Release occurred, 7-Eleven was required to immediately notify MDK and the parties were to agree on an allocation of responsibility for remediation costs at any of the Properties.  Despite the clear terms of the Agreement, 7-Eleven covered up Post-Closing Releases from MDK and continued to seek repayment of remediation costs from MDK relating to Post-Closing Releases.

78.    For example, 7-Eleven had a Post-Closing Release at Store No. 32580, located at 303 N. Main Street in Middlebury, Indiana.  With regard to this release, 7-Eleven belatedly acknowledged its responsibility, and subsequently started to abide by the terms of the Agreement, but failed to notify MDK as required under the Agreement and failed to consult with MDK as required by the Agreement.  MDK did begin to

apportion remediation expenses with regard to Post-Closing Releases at Middlebury. Nonetheless, prior to 7-Eleven acknowledging its Post-Closing Release at Middlebury, certain remediation expenses were paid by MDK that should have been attributed to 7-Eleven.

79.     7-Eleven was not as forthcoming with regard to Post-Closing Releases at other Properties, such as 1000 S. Main (Store No. 32581); 901 S. Mayflower (Store No. 32587) and County Line (Store No. 32590).  Despite being responsible for Post-Closing Releases at each of these sites, 7-Eleven has refused and continues to refuse to acknowledge its responsibility for such Post-Closing Releases, refuses to allocate remediation expenses at such sites, and refuses to indemnify MDK for the Post-Closing Releases as required under Section 11.3 of the Agreement.  Remediation expenses that have not been reimbursed by IDEM for these sites, including but not limited to legal fees and other litigation costs associated with sites on which Post-closing Releases occurred, must be apportioned between the parties.

80.     7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

81.     7-Eleven has breached its duty of good faith and fair dealing by failing to submit invoices for reimbursement.

82.     7-Eleven's actions caused damage to MDK in excess of $400,000, to be proven at trial.

## COUNT XII –BREACH OF CONTRACT –12TH STREET

83.     MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count XII.

84.    MDK has fully performed each and every one of its obligations under the Agreement.

85.    7-Eleven breached the Agreement and was grossly negligent and/or acted with willful misconduct in failing to properly remediate 12th Street (Store No. 32574) until more than one year after 7-Eleven was notified that remediation was necessary.

86.    For example, 7-Eleven was grossly negligent in failing to locate a city well field within 1200 feet of the site during Phase I and Phase II remediation.  7-Eleven and its agents therefore failed to take timely corrective action until more than a year later, causing damages including, but not limited to, increased legal fees to MDK, increased remediation expense, and increased settlement damages that MDK was forced to pay in a lawsuit relating to the 12th Street site.

87.    7-Eleven's actions caused damage to MDK in excess of $100,000, to be proven at trial.

### COUNT XIII – BREACH OF CONTRACT  – WRONGFUL INTEREST CHARGES

88.    MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count XIII.

89.    MDK has fully performed each and every one of its obligations under the Agreement.

90.    Despite the numerous bad acts set forth above, 7-Eleven wrongly claims that it is owed monies relating to the Remedial Measures, and therefore continues to charge interest at 10% to MDK for reimbursements that have been denied solely because of 7-Eleven's own failures set forth herein pursuant to Section 10.4(d) of the Agreement. As of January 2008, 7-Eleven claimed that MDK owed over $1 million in interest expense

relating to the Remedial Measures.  In reality, as set forth herein, had 7-Eleven complied with the Agreement, no payments would be due on the Remedial Measures, and no interest would be owed.

91.    7-Eleven has a duty to exercise its contractual discretion in good faith based on the implied covenant of good faith and fair dealing.

92.    7-Eleven has breached its duty of good faith and fair dealing as detailed above.

93.    7-Eleven's has wrongfully charged interest to MDK in excess of $1,000,000.

## COUNT XIV – BREACH OF FIDUCIARY DUTY – WRONGFUL INTEREST CHARGES

94.    MDK incorporates Paragraphs 1 through 22 of its Complaint as though fully set forth herein in this Count XIV.

95.    As agent for MDK, 7-Eleven had a duty of care and a duty of loyalty.

96.    7-Eleven repeatedly breached those duties by, inter alia, the actions set forth in Paragraphs 88-93 above.

97.    As a proximate result of 7-Eleven's breach of fiduciary duty, 7-Eleven has wrongfully charged interest to MDK in excess of $1,000,000.

**WHEREFORE**, Plaintiffs, MDK Corporation and C&J Realty, L.P., pray that this Court enter a judgment on their behalf and against the Defendant, 7-Eleven, and

a.    award damages to Plaintiffs in excess of $2,000,000, to be proven at trial;

b.    award attorneys' fees and expenses to Plaintiffs, as allowed by Section 11.3 of the Agreement;

c.    declare that Plaintiffs do not owe interest to 7-Eleven pursuant to the

Agreement;

and

d.    award such further and additional relief that this Court deems just and

equitable.

Respectfully submitted,

MDK Corporation and C&J Realty, L.P.


By:____/s/ Gary S. Caplan_____
       One of Their Attorneys

Gary S. Caplan (#6198263)
Max A. Stein (#6275993
REED SMITH LLP
10 S. Wacker Drive
Chicago, IL  60606-7507
(312) 207-1000
gcaplan@reedsmith.com
mstein@reedsmith.com

931128

16

FILED: JULY 30, 2008
08CV4336
JUDGE LEINENWEBER
MAGISTRATE JUDGE NOLAN

JFB

# PURCHASE AND SALE AGREEMENT

between

The Southland Corporation,

MDK Corporation, and

C & J Realty L.P.

**EXHIBIT**

A

## TABLE OF CONTENTS

ARTICLE I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

ARTICLE II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
    Sale and Purchase of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        Section 2.1 Sale and Purchase of Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
        Section 2.2 Limited Assumption of Liabilities . . . . . . . . . . . . . . . . . . . . . . . . -6-

ARTICLE III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
    Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        Section 3.1 Purchase Price; Allocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        Section 3.2 Purchase Price Adjustments . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        Section 3.3 Closing Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

ARTICLE IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
    Representations and Warranties of Seller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-
        Section 4.1 Corporate Status and Authority . . . . . . . . . . . . . . . . . . . . . . . . . -8-
        Section 4.2 Enforceability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
        Section 4.3 Title to Properties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -9-
        Section 4.4 Compliance with Laws; Permits . . . . . . . . . . . . . . . . . . . . . . . . -10-
        Section 4.5 Default Under Existing Leases and Third Party Subleases . . . . . . -10-
        Section 4.6 Default under Assumed Contracts . . . . . . . . . . . . . . . . . . . . . . . . -11-
        Section 4.7 Litigation; Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-
        Section 4.8 Broker . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
        Section 4.9 Description and Sufficiency of Assets . . . . . . . . . . . . . . . . . . . . . -12-
        Section 4.10 Financial Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
        Section 4.11 Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
        Section 4.12 Hazardous Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-
        Section 4.13 Judgments, Orders and Decrees; Litigation . . . . . . . . . . . . . . . -14-
        Section 4.14 Utilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
        Section 4.15 Insurance Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
        Section 4.16 Proprietary Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-
        Section 4.17 Powers of Attorneys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        Section 4.18 Condemnations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        Section 4.19 Zoning . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        Section 4.20 Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        Section 4.21 Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        Section 4.22 Employee Benefit Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-
        Section 4.23 Labor Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-
        Section 4.24 Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

ARTICLE V ........................................................ -16-
    Representations and Warranties of Purchaser ........................ -16-
        Section 5.1 Corporate Status and Authority of Purchaser ............ -16-
        Section 5.2 Enforceability ................................... -17-
        Section 5.3 Broker ......................................... -17-
        Section 5.4 Funding ........................................ -17-

ARTICLE VI ....................................................... -17-
    Covenants and Certain Actions of the Parties ....................... -17-
        Section 6.1 Certain Obligations of Seller ....................... -17-
            Section 6.1.1 Conduct of Business, etc. ..................... -17-
            Section 6.1.2 Access to Records, Assets and Personnel .......... -18-
            Section 6.1.3 Hart-Scott-Rodino .......................... -19-
            Section 6.1.4 Casualty and Condemnation .................... -19-
            Section 6.1.5 Sales Taxes and Other Taxes Due Prior to the Effective Time
                ............................................... -20-
            Section 6.1.6 No Solicitation of Sale or Disclosure ............ -20-
            Section 6.1.7 Payment of Liabilities ....................... -20-
            Section 6.1.8 Consents, Permits .......................... -20-
            Section 6.1.9 Withholding, Social Security and Unemployment Insurance
                Taxes ........................................... -21-
            Section 6.1.10 Notification .............................. -21-
            Section 6.1.11 Certificate of Occupancy .................... -21-
            Section 6.1.12 Food Service Obligations .................... -21-
            Section 6.1.13 Reasonable Efforts ......................... -22-
        Section 6.2 Certain Obligations of Purchaser .................... -22-
            Section 6.2.1 Hart-Scott-Rodino .......................... -22-
            Section 6.2.2 Employment Offers .......................... -22-
            Section 6.2.3 Purchaser's Review of Surveys and Title Policies ... -23-
        Section 6.3 Determination of Purchase Price Components ............ -24-
            Section 6.3.1 Physical Inventory - Merchandise Inventory ....... -24-
            Section 6.3.2 Physical Inventory - Motor Fuels Inventory ....... -24-
            Section 6.3.3 Physical Inventory - Supplies ................. -24-
            Section 6.3.4 Physical Inventory - Cash on Hand .............. -25-
        Section 6.4 Store Transition Procedure ......................... -25-
        Section 6.5 Removal of Excluded Assets ......................... -25-
        Section 6.6 Closing Date Real Property Proration  Amount ........... -26-
        Section 6.7 AC Proration Amount .............................. -26-
        Section 6.8 Memorandum of Purchase and Sale Agreement ............ -26-

ARTICLE VII ...................................................... -26-
    Conditions Precedent ........................................... -26-
        Section 7.1 Preamble ....................................... -26-

Section 7.2 Mutual Conditions to Obligation of Seller and Purchaser . . . . . . . -27-
    Section 7.2.1 Hart-Scott-Rodino Compliance . . . . . . . . . . . . -27-
    Section 7.2.2 Absence of Litigation . . . . . . . . . . . . . . . . . . . . . -27-
Section 7.3 Conditions to Obligations of Seller . . . . . . . . . . . . . . . . . . . -27-
    Section 7.3.1 Representations and Warranties of Purchaser . . . . . . . . . -27-
    Section 7.3.2 Officers Certificate . . . . . . . . . . . . . . . . . . . . . . . -27-
    Section 7.3.3 Actions at Closing . . . . . . . . . . . . . . . . . . . . . . -27-
Section 7.4 Conditions to Obligations of Purchaser . . . . . . . . . . . . . . . -27-
    Section 7.4.1 Representations and Warranties of Seller . . . . . . . . . . -27-
    Section 7.4.2 Officer's Certificate . . . . . . . . . . . . . . . . . . . . -27-
    Section 7.4.3 Actions at Closing . . . . . . . . . . . . . . . . . . . . . . -28-
    Section 7.4.4 Removal of Liens . . . . . . . . . . . . . . . . . . . . . . . -28-
    Section 7.4.5 Consents . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
    Section 7.4.6 Permits . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-
    Section 7.4.7 Seller's Principal . . . . . . . . . . . . . . . . . . . . . . . -28-
    Section 7.4.8 Seller's Satisfaction of Primary Condition Precedent . . . . -28-

ARTICLE VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-
Closing; Certain Post Closing Obligations . . . . . . . . . . . . . . . . . . . . . . . -29-
    Section 8.1 Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-
    Section 8.2 Post Closing Inventory Payments . . . . . . . . . . . . . . . . . . -32-
    Section 8.3 Post Closing Motor Fuels Equipment Transfer Notification . . . . -32-
    Section 8.4 Post Closing Access . . . . . . . . . . . . . . . . . . . . . . . . . -32-
    Section 8.5 Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-
    Section 8.6 Non-Competition Covenant . . . . . . . . . . . . . . . . . . . . . -33-
    Section 8.7 Application of Transaction Tax Amount . . . . . . . . . . . . . . . -33-

ARTICLE IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
    Section 9.1 Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-
    Section 9.2 Limitation on Right to Terminate; Effect of Termination . . . . . -34-

ARTICLE X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
Environmental . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 10.1 Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-
    Section 10.2 Environmental Reports to Purchaser; Notification . . . . . . . . -35-
    Section 10.3 Asbestos-Containing Materials . . . . . . . . . . . . . . . . . . -36-
    Section 10.4 Remedial Measures . . . . . . . . . . . . . . . . . . . . . . . . -36-
    Section 10.5 Completion of Remedial Measures . . . . . . . . . . . . . . . . -38-
    Section 10.6 Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -38-
    Section 10.7 Post-Closing Releases . . . . . . . . . . . . . . . . . . . . . . . -38-
    Section 10.8 Cooperation; Survival . . . . . . . . . . . . . . . . . . . . . . . -39-
    Section 10.9 Acknowledgment of Motor Fuels Equipment Regulation . . . . . -39-

ARTICLE XI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
        Section 11.1 Survival of Representations and Warranties; Right to Indemnification
            Not Affected by Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
        Section 11.2 Indemnification by Seller . . . . . . . . . . . . . . . . . . . . . . . . . . . -40-
        Section 11.3 Indemnification by Purchaser . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
        Section 11.4 Notification Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-
        Section 11.5 Indemnity Basket . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-
        Section 11.6 Right of Set-Off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -42-

ARTICLE XII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
    Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
        Section 12.1 Modification, Waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
        Section 12.2 Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
        Section 12.3 Further Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
        Section 12.4 Waiver of Bulk Sales Act Compliance . . . . . . . . . . . . . . . . . . -43-
        Section 12.5 Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-
        Section 12.6 Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-
        Section 12.7 Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-
        Section 12.8 Publicity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-
        Section 12.9 Disclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        Section 12.10 Counterpart . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        Section 12.11 Headings; References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        Section 12.12 Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        Section 12.13 Pronouns and Plurals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        Section 12.14 Arms Length Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-
        Section 12.15 Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT dated as of Dec. 24 , 1997, is by and between The Southland Corporation, a Texas corporation ("Purchaser"), with an address at 2711 North Haskell Avenue, Dallas, Texas 75204, and MDK Corporation, an Indiana corporation with an address at 415 New Street, P.O. Box 96, Goshen, Indiana 46529-0096, and C & J Realty L.P., an Indiana limited partnership with an address of 415 New Street (collectively, "Seller").
Goshen, Indiana 46529, 0096

In consideration of the mutual covenants and agreements contained herein, Seller and Purchaser agree as follows:

## ARTICLE 1

### Definitions

Capitalized terms used herein shall have the meanings ascribed to them in Article I unless such terms are defined elsewhere in this Agreement.

ACM Tests: As defined in Section 10.1(b).

AC Proration Amount: As defined in Section 6.7

Adjusted Purchase Price: As defined in Section 3.2.

Affiliate: Any Person controlling, controlled by, or under common control with Seller or Purchaser as the case may be. The term "control" as used in the preceding sentence means, with respect to a corporation, the right to exercise, directly or indirectly, 50% or more of the voting rights attributable to the shares of the controlled corporation, and with respect to any Person other than a corporation, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person.

Agreement: This Purchase and Sale Agreement and all schedules attached hereto.

Assets: All of Seller's assets, properties, rights and businesses of every kind and description relating to Seller's operation of convenience stores on the Properties, including, without limitation, the Properties, Inventory, Supplies, Equipment, Change Fund, Records, Personal Property, and Proprietary Rights, excluding the Excluded Assets.

Assigned Values: With respect to any particular Property, the fair market value as set forth in Schedules 1.3 and 1.5.

Assumed Contracts: The Contracts described in Schedule 1.1.

-1-

Assumed Liabilities: As defined in Section 2.2.

Change Fund: As defined in Section 6.3.4.

Closing: As defined in Section 8.1.

Closing Date: As defined in Section 8.1.

Closing Date Real Property Proration Amount: As defined in Section 6.6.

Code: The Internal Revenue Code of 1986, as amended, together with any and all rules and regulations promulgated thereunder.

Contracts: All agreements, contracts, leases and other contractual commitments to which Seller is a party and which relate principally to the Assets or the Stores Business.

Damages: Losses, liabilities, obligations, costs, expenses (including interest, penalties and reasonable attorneys fees and disbursements), litigation, proceedings, fines, taxes, levies, imposts, duties, deficiencies, assessments, charges, penalties, allegations, damages or judgments of any kind or nature.

Effective Time: For each Property, the time that the operation of the Stores Business at the Property is turned over to Purchaser, which shall occur at the conclusion of the Store Transition.

Employees: All those employees of Seller assigned principally to the Stores Business on a full-time or part-time basis (including maintenance and office personnel).

Environmental Testing: The Motor Fuels Equipment Tests, ACM Tests, Phase I and the Phase II Tests (all as defined in Section 10.1), collectively.

Environmental Report: As defined in Section 10.2.

Equipment: All equipment, machines, materials and furniture (but excluding the Inventory, Motor Fuels Equipment, Supplies and Excluded Assets) owned or used by Seller principally in connection with the Stores Business and located on the Properties.

ERISA: The Employee Retirement Income Security Act of 1974, as amended.

Excluded Assets: The tangible and intangible assets, properties, contracts and rights described in Schedule 1.2.

Existing Leased Properties: All real property identified in Schedule 1.3 as being currently leased or subleased to Seller pursuant to a Lease.

Existing Leases: All leases identified in Schedule 1.4, pursuant to which Seller currently holds a leasehold interest in a Property.

Governmental Entity: Any legislature, court, governmental department, commission, instrumentality, board, agency or authority.

Hazardous Materials: As defined in Section 4.12.

Improvements: Any owned or leased (as the case may be) buildings, gasoline canopies, improvements or fixtures which are located on the Properties other than the Equipment, Motor Fuels Equipment and the Excluded Assets.

Interim Period: As defined in Section 6.1.1

Interest Rate: The rate of interest publicly announced from time to time by Citibank, N.A. in New York, New York as its "Base Rate."

Inventory: The Merchandise Inventory and Motor Fuels Inventory.

Landlord Consent and Estoppel Certificate: As defined in Section 7.4.5.

Legal Requirement: Any law, rule, ordinance, requirement, regulation, order, writ, judgment, injunction, decree or award issued, enacted, imposed or promulgated by any Governmental Entity.

Liens: All liens (including judgment and mechanics' liens, regardless of whether liquidated or perfected), security interests, mortgages, assessments, deeds of trust, charges, claims or encumbrances of any kind or nature.

Lottery License Permits: The Permits relating to the sale of lotto or lottery tickets.

Merchandise Inventory: All products and other items reflected as inventory for resale to customers and located on the Properties including any merchandise items containing any Proprietary Rights, but excluding (i) any Supplies, (ii) Motor Fuels Inventory and (iii) any Excluded Assets.

Motor Fuels Equipment: Any (i) underground storage tanks and associated piping, lines, dispensers, leak detectors, pumps and other related equipment, (ii) except to the extent constituting an Excluded Asset, any aboveground storage tanks and associated piping and related equipment, (iii) any mechanical or automatic equipment used to wash cars and/or (iv) gasoline branding and other related signage, in each case either owned by Seller or owned by a third party other than Seller and used by Seller pursuant to a Lease or other Contract.

-3-

Motor Fuels Inventory: Any and all (i) motor fuels inventory (including regular, unleaded and premium motor fuel and/or diesel fuel), within any underground storage tanks located on the Properties and (ii) except to the extent constituting an Excluded Asset, kerosene within any aboveground storage tanks on the Properties.

Motor Fuels Inventory Price: As defined in Section 6.3.2.

New Leased Properties: All real properties currently owned in fee by Seller or an Affiliate of Seller and identified in Schedule 1.5, which will be leased to Purchaser pursuant to Section 8.1 (e).

Non-Competition and Consulting Agreement: As defined in Section 8.1(m).

Operative Document: This Agreement and all other documents and instruments executed and delivered by Seller and/or Purchaser or Seller's Principal, as the case may be, at Closing in connection with this transaction.

Permits: As defined in Section 4.4(b).

Permitted Real Property Encumbrances: As defined in Section 6.2.3(b) or any document or obligation comprising an Assumed Liability.

Person: Any individual, partnership, joint venture, corporation, bank, trust, unincorporated organization and/or Governmental Entity.

Personal Property: All tangible personal property owned by Seller in connection with the Stores Business and located on the Properties, other than the Equipment, Motor Fuels Equipment, Inventory, Supplies, Records and Excluded Assets.

Physical Inventory: As defined in Section 6.3.1.

Plans: As defined in Section 4.23.

Primary Condition Precedent As defined in Section 7.4.8.

Promissory Note: As defined in Section 8.1(c).

Properties: All New Leased Properties and Existing Leased Properties.

Proprietary Rights: As defined in Section 4.16.

Purchase Price: As defined in Section 3.1.

-4-

Reasonable Efforts:  The efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible.

Records:  Those books, records, files, plans and other documents and instruments (including property files, construction files, employee files and I-9 Forms) relating to the Assets and the Successor Employees, excluding the Excluded Assets.

Rejected Property:  As defined in Section 3.2(c).

Retained Liabilities:  As defined in Section 2.2.

Seller's Principal:  Joseph J. Peters

Store Transition:  As defined in Section 6.4.

Stores Business:  The business carried on and conducted by Seller principally in connection with the Assets.

Successor Employees:  As defined in Section 6.2.2(a).

Supplies:  All supplies, including, but not limited to, syrups, cups, coffee, hot chocolate, napkins, straws and cleaning supplies, and bulk "deli food" items and any items containing any Proprietary Rights which are located on the Properties on the Closing Date.

Taxes:  All taxes, charges, fees, levies or other assessments, including, without limitation, all net income, gross income, gross receipts, sales, use, ad valorem, transfer, franchise, profits, license, withholding, payroll, employment, excise, estimated, severance, stamp, occupation, property or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any federal, state, local, foreign or other taxing authority.

Third Party Sublease:  All leases or subleases shown on Schedule 1.6 affecting any Property pursuant which Seller is the landlord or sublandlord.

Title Company:  Chicago Title Company

Title Commitments:  As defined in Section 6.2.3(a).

Title Objections:  As defined in Section 6.2.3(b).

Title Policies.  As defined in Section 6.2.3(a).

Transaction Tax Amount:  As defined in Section 8.1(j).

## ARTICLE II

### Sale and Purchase of Assets

Section 2.1 Sale and Purchase of Assets. Subject to all of the terms and conditions of this Agreement and in reliance upon the representations and warranties contained herein, at the Closing, Seller shall sell, lease, transfer and/or deliver, as set forth herein, to Purchaser, and Purchaser shall purchase or lease, pay for and receive from Seller, as set forth herein, the Assets, free and clear of all Liens (except for Permitted Real Property Encumbrances).

Section 2.2 Limited Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall assume and agree to pay, perform and discharge in due course only those liabilities and obligations of Seller arising under the Assumed Contracts and such other liabilities expressly described on Schedule 2.2 (collectively, "Assumed Liabilities"). Except for the Assumed Liabilities, Purchaser shall not assume, nor shall Purchaser pay, perform, discharge or otherwise be responsible for, any debts, liabilities, obligations, contracts, loans, leases, commitments or undertakings of Seller, whether fixed, unliquidated, absolute, contingent, or otherwise, and whether due or to become due, known or unknown ("Retained Liabilities") including without limitation, the following liabilities or obligations: (a) any liability arising out of or relating to the ownership or operation of the Stores Business or the Assets prior to the Closing including, but not limited to, any liability arising out of the ownership, use, or operation of the Motor Fuels Equipment; (b) any liability of Seller for any Taxes relating to any period before the Closing Date; (c) any liability of Seller, the existence of which would constitute an inaccuracy in any of Seller's representations and warranties, or a breach of any of Seller's covenants or agreements, contained in this Agreement or in any certificate, document or instrument delivered or to be delivered in connection with the transactions contemplated hereby; (d) any liability or obligation of Seller under or by reason of any Plan; (e) except as otherwise set forth in Section 6.2.2, any liability or obligation of Seller with respect to any compensation (including, without limitation, salary and bonuses, vacation, medical and other benefits) payable or alleged to be payable to any past or current partner, employee, agent or independent contractor of Seller; (f) any liability or obligation of Seller owed to any of its Affiliates; (g) any liability of Seller arising from or in connection with any product warranty or product liability claims relating to goods sold, or services rendered, prior to the Closing Date; (h) any liability of Seller resulting from the negotiation and consummation of the transactions contemplated by this Agreement including any broker's or finder's fee or commission or (i) any liability of Seller for a violation of, or failure to satisfy any Legal Requirement incurred or imposed prior to the Closing.

-6-

ARTICLE III

Purchase Price

Section 3.1  Purchase Price; Allocation.

(a)    Subject to the provisions of Section 3.2, the portion of the aggregate purchase price ("Purchase Price") which is payable at the Closing for the Assets (exclusive of the Merchandise Inventory, Motor Fuels Inventory, Supplies and Change Fund) shall be $2,000,000.00 and the actual amount necessary to pay Seller's obligations to Marathon Oil Company for the Marathon equipment (not to exceed $600,000.00), both of which shall be paid in cash at Closing and $3,500,000, which shall be evidenced by a Promissory Note given by Seller to Purchaser at Closing. For purposes of this Agreement, the term Purchase Price shall also include all lease/rental and/or other payments to be made for the Properties, paid in the amounts and at such times as set forth in Schedule 3.1(a). In addition to the Purchase Price, Purchaser will pay to Seller (i) at Closing, the Change Fund and the Transaction Tax Amount and (ii) in accordance with the terms of Section 8.2, the Merchandise Inventory Price, the Motor Fuels Inventory Price, and the Supplies Price. At Closing, Purchaser shall also deliver to Seller's Principal the consideration set forth in the Non-Competition and Consulting Agreement.

(b)    Seller and Purchaser shall allocate the Purchase Price and other amounts paid with respect to the Assets in the manner determined after the Closing, which allocation shall be prepared in accordance with Section 1060 of the Code ("Final Allocation"). Such Final Allocation shall be adopted for all purposes related to the sale of the Assets hereunder, and Seller and Purchaser agree not to file a tax return or otherwise take a position for tax purposes inconsistent with this allocation. In connection with the preparation of the Final Allocation, Seller agrees to promptly provide such information as Purchaser may reasonably request to enable Purchaser to prepare such Final Allocation. Purchaser shall provide Seller with a preliminary allocation not later than 30 days following its receipt from Seller of all requested information. If Seller objects to such allocation in writing to Purchaser within 20 days after its receipt of the preliminary allocation by Purchaser, the parties shall use good faith efforts to resolve such objections. If no such written objection is received by Seller within such 20 day period, Purchaser's preliminary allocation shall be deemed for all purposes to be the Final Allocation.

Section 3.2  Purchase Price Adjustments:  At Closing, the Purchase Price shall be adjusted as necessary to reflect each of the following (the Purchase Price, as so adjusted, is referred to as the "Adjusted Purchase Price"):

(a)    the amount of the Closing Date Real Property Proration Amount;

(b)    the amount of the AC Proration Amount;

(c)    if the transaction described herein does not close with respect to any one or more of the Properties pursuant to Sections 6.1.4, 6.2.3 or 10.6 (each such Property hereinafter

-7-

referred to as a "Rejected Property"), then the Purchase Price shall be reduced by all payments (including the lease/rental payments) assigned to each Rejected Property as set forth on Schedule 3.1(a);

(d)    any adjustments to the lease/rental payments (and the corresponding option prices) assigned to the respective Properties resulting from Sections 6.1.4, 6.2.3 or 10.6; and

(e)    as otherwise may be provided herein.

Section 3.3  Closing Expenses.

(a)    Except as otherwise set forth in this Section 3.3, Seller shall pay (i) all recording fees, charges and taxes, sales taxes and real property assignment or transfer taxes, (including document stamps), consent fees, title insurance commitment and policy premiums and fees, and any other similar fees or costs payable in connection with the transactions contemplated hereby, (ii) one-half of the fees, if any, owed to Title Company with respect to the Escrow of conveyance document, and (iii) all Environmental Repairs costs and expenses.

(b)    Purchaser shall pay (i) one-half of the fees, if any, owed to Title Company with respect to the escrow of conveyance documents, (ii) the Transaction Tax Amount; (iii) Survey Fees and (iv) the Environmental Testing costs.

(c)    In the event Seller or Purchaser, as the case may be, pays any of the fees, costs or taxes payable by the other party, such other party shall promptly reimburse Seller or Purchaser, as the case may be, for the full amount so paid.

## ARTICLE IV

### Representations and Warranties of Seller

Seller makes the following representations and warranties to Purchaser:

Section 4.1  Corporate Status and Authority.

(a)    MDK Corporation is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Indiana. C & J Realty L.P. is a duly constituted Indiana limited partnership. Seller has all requisite corporate and/or partnership power and authority to own the New Leased Properties or lease the Existing Leased Properties owned or leased by them and each has the authority to execute and deliver this Agreement and the other Operative Documents to which they are parties and to perform their obligations hereunder and thereunder, and the execution, delivery and performance of this Agreement and the other Operative Documents have been duly authorized by all necessary corporate and partnership action on the part of Seller. Within five (5) days after Seller's satisfaction of the Primary Condition Precedent, Seller shall provide to Purchaser (i) a Certificate of Good Standing from the State of Indiana as to MDK Corporation, a Certificate of

-8-

Registration from the State of Indiana as to C & J Realty L.P., and (ii) certified copies of MDK Corporation's corporate resolutions and comparable documentation from C & J Realty L.P., authorizing the execution of this Agreement and the fulfillment of the transactions contemplated herein. Seller's principal represents and warrants that he is an authorized officer of MDK Corporation and a general partner of C & J Realty L.P. and authorized to bind the corporation partnership to this Agreement and the fulfillment of the transactions contemplated herein

(b)     Except as otherwise expressly provided in this Agreement, the execution and delivery of this Agreement and the Operative Documents by Seller and Seller's Principal, the consummation of the transactions contemplated hereby or thereby, and compliance with or fulfillment of the terms and provisions of this Agreement and the Operative Documents by the Seller: (i) will not require any authorization, consent, approval, license, exemption of or filing or registration with any Governmental Entity or other third party except such that is lawfully and validly obtained prior to the Closing, (ii) will not cause Seller to violate or contravene any Legal Requirement, (iii) will not violate or be in conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under, any material agreement, lease or instrument, commitment or arrangement to which Seller is a party or by which Seller or any of the Assets is bound or affected, or give any party with rights under any such material agreement, lease or instrument, commitment or arrangement the right to terminate, modify or otherwise change the rights or obligations of Seller thereunder, (iv) will not violate or contravene any provision of Seller's Articles of Incorporation or Bylaws or partnership agreement, and (v) will not result in the creation or imposition of any Lien on any of the Assets. Seller is not subject to any restriction of any kind or character which prohibits Seller from entering into this Agreement or the Operative Documents or would prevent the performance of or compliance with all or any part of this Agreement or the Operative Documents or the consummation of the transactions contemplated hereby.

Section 4.2 Enforceability. This Agreement does, and each of the other Operative Documents when executed and delivered shall, constitute a legal, valid and binding joint and several obligation of MDK Corporation and C & J Realty L.P. enforceable jointly and severally in accordance with its terms against MDK Corporation and/or C & J Realty L.P., subject, as to enforcement, to bankruptcy, insolvency, reorganization and other similar laws and judicial decisions of general applicability relating to or effecting creditors' rights and to general principles of equity.

Section 4.3 Title to Properties.

(a)     Except as Seller has stated in Section 7.4.8, Seller owns good and marketable title to its respective New Leased Properties, and any Improvements on any Existing Leased Property owned by Seller pursuant to the Existing Leases, free and clear of any Liens except for the Permitted Real Property Encumbrances. In the event Seller shall acquire the fee title to any Existing Leased Property prior to the closing, any such property shall then become a New Leased Property for all purposes under the Agreement and Schedules 1.3, 1.4 and 1.5 shall be revised accordingly.

-9-

(b)    Schedules 1.4 and 1.6 attached hereto contains a true, complete and correct list of each Existing Lease and Third Party Sublease, respectively, and each modification, amendment and supplement thereto and shall identify any affected real property by common address, legal description, and, if applicable, Tax I.D. number. Seller has previously delivered to Purchaser a true, complete and correct copy of each Existing Lease and Third Party Sublease and each modification, amendment and supplement thereof. Seller is the current tenant under each Existing Lease and holds good and transferable title to the tenant's interest in each Existing Lease and all leased Improvements thereon, subject only to the terms of such Existing Lease and the Permitted Real Property Encumbrances. Seller is current in the payment of all taxes, utilities, common area charges, rent and other payments required under each such Existing Lease to be made to the landlord thereunder or third parties.

(c)    Except as disclosed in Schedule 4.3(c) and Section 7.4.8, the Equipment (other than any leased Equipment), Inventory and Supplies are owned by Seller free and clear of any Liens.

(d)    Seller has good and marketable title to all Assets other than as described in Sections 4.3(a), 4.3(b), 4.3(c) and 7.4.8, free and clear of all Liens.

Section 4.4  Compliance with Laws; Permits.

(a)    Seller (i) is not in violation of any Legal Requirement or Permit, (ii) has not received any notice of any alleged violation of, nor any citation for noncompliance with, any Legal Requirement or Permit (except for minor violations or events of noncompliance which have been cured or remedied) and (iii) is currently conducting the Stores Business without violating any Legal Requirement or Permit (including, without limitation, all Legal Requirements relating to employment, employee benefits, Hazardous Materials and other environmental matters or the sale of alcoholic beverages or lottery tickets) promulgated by any Governmental Entity relating to the Stores Business or the Assets.

(b)    Seller possesses, and is operating in compliance with, all franchises, licenses, permits, certificates, authorizations, rights and other approvals of any Governmental Entity necessary to conduct the Stores Business as currently conducted, including, but not limited to, appropriate current certificates of occupancy ("Permits"). Schedule 4.4(b) contains a true and complete list and description of all Permits. Each Permit has been lawfully and validly issued, and no proceeding is pending or, to Seller's knowledge, threatened looking toward the revocation, suspension or limitation of any Permit. Except as set forth on Schedule 4.4(b), all of the Permits are freely assignable by Seller without the consent of the issuing Governmental Entity.

Section 4.5  Default Under Existing Leases and Third Party Subleases  Except as disclosed in Schedule 4.5, with respect to each Existing Lease or Third Party Sublease, (a) Seller is not in default under any Existing Lease and Third Party Sublease nor has any event occurred which, with notice or lapse of time or both, would constitute a default by Seller thereunder, (b) each such Existing

Lease or Third Party Sublease, as modified, amended or supplemented as set forth in Schedules 1.4 and 1.6, is valid and binding and in full force and effect according to its terms and has not been otherwise modified, amended or supplemented and there are no oral agreements or amendments with respect thereto; (c) Seller does not intend, and knows of no intention of any other party, to (x) terminate or otherwise modify, amend or supplement such Existing Lease or Third Party Sublease or (y) assert any defenses, counterclaims or right of set-off, and (d) to Seller's knowledge, each other party to each Existing Lease or Third Party Sublease has in all respects performed all the obligations required to be performed by such party to date thereunder. Except as otherwise disclosed in Schedule 4.5, all Existing Leases may be assigned by Seller to Purchaser without the consent of the landlord thereunder.

## Section 4.6  Default under Assumed Contracts

(a)    Schedule 1.1 attached hereto contains a true, complete and correct list of each Assumed Contract and each modification, amendment or supplement with respect thereto. Seller has previously delivered to Purchaser true, complete and correct copies of all Assumed Contracts and all modifications, amendments or supplements with respect thereto. Except as set forth in Schedule 4.6(a), other than the Assumed Contracts, Seller is not a party to, nor are any of the Assets bound by, any agreement, instrument, lease, contract or commitment which would be material to the operation of the convenience stores (with or without motor fuels as the case may be) by Purchaser after the Closing in the manner it has been (and is now being) conducted, other than the Existing Leases and Third Party Subleases. Except as set forth in Schedule 1.1, each Assumed Contract may be canceled or terminated without cause and without any penalty or payment of money by Seller on no more than 30 days prior notice.

(b)    Except as disclosed in Schedule 4.6(b), (a) Seller is not in default under any Assumed Contract, nor has any event occurred which, with notice or lapse of time or both, would constitute a default by Seller under any such Assumed Contract, (b) each such Assumed Contract, as modified, amended or supplemented as set forth on Schedule 1.1 is valid and binding and in full force and effect according to its terms and has not been otherwise modified, amended or supplemented and there are no oral agreements or amendments with respect thereto, (c) Seller does not intend and Seller knows of no intention of any party to (x) terminate or otherwise modify, amend or supplement such Assumed Contract or (y) assert any defenses, counterclaims or right of set-off, and (d) to Seller's knowledge, each other party to each Assumed Contract, has in all respects performed all the obligations required to be performed by such party to date thereunder. Except as disclosed in Schedule 4.6(b), all such Assumed Contracts may be assigned by Seller to Purchaser without the consent of the other party thereto.

Section 4.7  Litigation; Citations.  Schedule 4.7 lists all actions, suits, proceedings, claims, demands or governmental investigations pending or, to the knowledge of Seller, threatened by any Person against Seller in connection with the Assets or Stores Business and specifically identifies any of the foregoing which (i) has or is reasonably likely to have, if adversely determined, a material and adverse effect, on this transaction, the Assets or the Stores Business, or Seller's ability to perform its obligations hereunder and under the Operative Documents or (ii) challenges or may challenge the

-11-

validity of this Agreement or any of the Operative Documents or seeks to enjoin or otherwise restrain the transactions contemplated herein.

Section 4.8 Broker. All negotiations relating to this Agreement and the transactions contemplated hereby have been conducted without the intervention of any person acting on behalf of Seller in such manner as to give rise to any valid claim against Purchaser for any broker's or finder's commission, fee or similar compensation.

Section 4.9 Description and Sufficiency of Assets.

(a)     Within ten (10) days of the Primary Condition Precedent Seller shall provide to Purchaser a list of Equipment and Personal Property which shall be true, complete and correct in all material respects.

(b)     The Merchandise Inventory, Motor Fuels Inventory, ~~Liquor inventory,~~ and Supplies consist of a quality and quantity saleable or usable, as the case may be, in the ordinary course of the Stores Business, except for (i) those items of Merchandise Inventory which are damaged or out of code and (ii) those Supplies which are damaged or unfit for their intended use, neither of which, individually or in the aggregate, are material.

(c)     The Equipment and other Improvements are in good repair and good working order, ordinary wear and tear excepted, have been maintained in accordance with good industry practices, are sufficient to operate the Stores Business at the Properties and are suitable for the uses for which they are intended.

(d)     The Assets, the rights assigned under the Assumed Contracts, Existing Leases and Third Party Subleases and the rights granted to or acquired by the Purchaser under the Operative Documents are sufficient in all material respects for the conduct of the convenience stores (with or without motor fuels, as the case may be) by Purchaser after the Closing in the manner it has been (and is now being) conducted.

Section 4.10 Financial Information. Seller has previously delivered to Purchaser true, complete and correct copies of the financial statement and other financial information described in Schedule 4.10 ("Financial Information"). Seller's financial statements are prepared in accordance with generally accepted accounting principles. Since the date of such Financial Information, the Stores Business has been conducted only in the ordinary course of business. There has been no material change to the Stores Business since the date of the Financial Information.

Section 4.11 Tax Matters. All federal, state, county, city and other tax returns required to be filed by or on behalf of Seller with respect to the Assets or the Stores Business have been timely and accurately filed and all Taxes which have been or may be due pursuant to said returns, pursuant to any assessment received or otherwise have been paid or provision has been made for the payment thereof. Seller has not received from the Internal Revenue Service or from the tax authorities of any

-12-

state, county or city any notice of underpayment of Taxes which has not been paid, and no audits, proceedings or other actions are currently pending before or, to Seller's knowledge, threatened by, any Governmental Entity with respect to any Taxes or returns specifically relating to the Assets or the Stores Business.

Section 4.12 Hazardous Materials.

(a)    Except as disclosed in Schedule 4.12(a), no Hazardous Material (i) has been stored, generated, used, manufactured, treated, deposited, released, handled or disposed of on or under any Property or, to Seller's knowledge, is presently located on or under any Property, threatens to migrate onto any Property from an offsite source, or has or is likely to migrate offsite from any Property, (ii) is required to be eliminated, removed, treated or mitigated by Seller under any Legal Requirement or (iii) is of a type, location, material, duration, magnitude, nature or condition which requires or has required notification by Seller to third parties (including any Governmental Entity) under any Legal Requirement.

(b)    With respect to Hazardous Materials and Motor Fuels Equipment, except as disclosed in Schedule 4.12(b), Seller (i) is in compliance with all Legal Requirements including, but not limited to, any Legal Requirements relating to the registration, upgrading, testing or maintenance of Motor Fuels Equipment, (ii) has not received any notice of any alleged violation of, nor any citation for noncompliance with, any Legal Requirement, (iii) is conducting any and all environmental remedial activities at or relating to the Properties in accordance with all Legal Requirements, (iv) is eligible to receive reimbursement (other than applicable deductibles, if any) for any expenses incurred in connection with any remedial activities being taken or to be undertaken at or relating to the Properties, (v) has, to the extent required by applicable Legal Requirement or otherwise necessary to perform any remedial activities, properly notified any owner, tenant or occupant of property in the vicinity of any Property that Hazardous Materials have, or may have, migrated onto to such other Persons' property and where necessary or otherwise desirable to perform remedial activities, obtained all rights of access to such other Persons' properties pursuant to fully assignable written access agreements, (vi) has not received notice from any third party that Hazardous Materials have migrated or threatened to migrate on or under any Property from an offsite source, and (vii) is not subject to (or to Seller's knowledge, there has not been threatened) any claim, suit, allegation, or otherwise by any Person alleging personal injury, diminution in property value or otherwise as a result of any release, deposit, disposal, treatment or migration of any Hazardous Material at, on or from any Property.

(c)    For purposes of this Agreement, "Hazardous Material", means oil, gasoline, diesel, kerosene, MTBE, asbestos-containing materials, PCBs, and any other substances defined as "hazardous substances", "hazardous materials", "regulated substances" or "toxic substances" in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. 9601, et. seq. as amended; the Hazardous Materials Transportation Act as amended, 49 U.S.C. 1980 et. seq.; the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et. seq.; and in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws, and any constituents or by-products of, and/or additives to, such substances.

-13-

(d)     Within ten (10) days after Seller's satisfaction of the Primary Condition Precedent, Seller will deliver to Purchaser true and correct copies and results of any (i) reports, studies, tests, or monitoring performed or initiated by Seller and (ii) any OSHA incident logs and/or notices of violations or warnings issued by any Governmental Entity, in each case pertaining to Hazardous Materials in, on, under or migrating from the Properties or concerning compliance by Seller with applicable Legal Requirements.

Section 4.13 Judgments, Orders and Decrees; Litigation.  Neither (i) Seller, (ii) any of the officers or directors of Seller nor (iii) any Employee is subject to any outstanding judgment, order, writ, injunction, decree, stipulation, determination or award of, or agreement with, any Governmental Entity or any arbitrator limiting, restricting or adversely affecting the conduct, condition, operating results or prospects of Stores Business or, with respect to Employees, the ability of any Employee to perform diligently his or her duties to Seller.

Section 4.14 Utilities.  All water, sewer, gas (if any), electric, telephone and drainage facilities and all other utilities required by law or otherwise necessary for the existing use and operation of Properties are installed to the Properties and are connected pursuant to valid Permits (if required). Such utilities are adequate to service the requirements of the Stores Business as currently operated by Seller and, are in full compliance with all Legal Requirements and, where required, all installation and connection charges in connection therewith have been paid in full.

Section 4.15 Insurance Policies.  In connection with the operation of the Stores Business, Seller maintains insurance with responsible and reputable insurance companies or associations in such amounts and against such risks as (i) Seller has in good faith determined to be sufficient for the conduct of the Stores Business, (ii) as may be required under any Existing Lease or Contract and (iii) as may be required by applicable Legal Requirements.  There is no default with respect to any provisions contained in any such policies nor has there been any failure to give notice of or present any claim under such policies in a due and timely fashion.  No notice of cancellation or non-renewal of any such policy has been received, and Seller has no reason to believe that any such policies will be canceled or non-renewable in the future.

Section 4.16 Proprietary Rights.  Schedule 4.16 lists all of the trademarks, tradenames, service marks, service names, patents or other intellectual property owned or licensed by Seller and used by Seller in connection with the Stores Business ("Proprietary Rights").  Except as otherwise set forth in Schedule 4.16, Seller requires no other right under any patent, trademark, tradename, copyright (or any application or registration in respect thereof), design, discovery, improvement, process, formula, data or other proprietary information in order to conduct the Stores Business in the manner as it is currently being conducted.  In connection with the Stores Business, Seller has not granted any outstanding licenses and has no obligation to grant licenses under any of the Proprietary Rights listed in Schedule 4.16.  Seller has no knowledge of and has not received any notice of conflict with the asserted right of any other Person with respect to the Proprietary Rights in connection with the Stores Business.   To Seller's knowledge, no other Person is infringing any Proprietary Right used in connection with the Stores Business.

Section 4.17 <u>Powers of Attorneys</u>  There are no Persons holding a power of attorney from Seller relating to the Assets or the Stores Business.

Section 4.18 <u>Condemnations</u>.  Except as set forth in Schedule 4.18, Seller has not received any written or oral notices of any condemnation or similar proceeding affecting any of the Properties nor does Seller have any knowledge of any pending condemnation, expropriation, eminent domain or other similar proceeding affecting all or any portion of any Property.

Section 4.19 <u>Zoning</u>.  Except as set forth in Schedule 4.19, the Properties are currently zoned for 24-hour convenience store use and, to Seller's knowledge, the current operation of the Stores Business at each Property does not violate any applicable zoning requirement.  To Seller's knowledge, no zoning changes are pending (or would result from the consummation of the transactions herein) which would restrict or otherwise impair Seller's operation of the Stores Business, or Purchaser's operation of the Properties after the Closing, as 24-hour convenience stores with motor fuels sales at those Properties where motor fuels are currently sold.

Section 4.20 <u>Access</u>.  All curb cuts and street openings, permits or licenses required for vehicular access to and from adjoining public streets or to any parking spaces utilized in connection with the Properties are in full force and effect, fully paid for, and shall inure to the benefit of Purchaser. Seller is not aware of any plans or proposals of any Governmental Entities which would restrict or redirect any traffic flow in a manner which would materially impact the Stores Business at any Property.

Section 4.21 <u>Bonds</u>  Except as described in Schedule 4.21, Seller maintains no surety or other bonds in connection with its operation of the Stores Business on the Properties and no surety or other bonds will be required by Purchaser at the Closing in order to conduct the Stores Business.

Section 4.22 <u>Employee Benefit Plans</u>.

(a)    Schedule 4.22 hereto contains a true and complete list and description of (i) each employee welfare benefit plan (an "Employee Welfare Plan"), as defined in Section 3(3) of ERISA, currently maintained by Seller or any Affiliate or to which Seller or any Affiliate contributes or is required to contribute, for the benefit of Employees, and (ii) every pension, profit-sharing, deferred compensation, bonus, stock option or stock purchase, severance, health insurance or other similar employee benefit plan, agreement or understanding currently maintained by Seller or any Affiliate or to which Seller or any Affiliate contributes or is required to contribute, for the benefit of any of the Employees (collectively, the "Plans").

(b)    With respect to each Plan currently maintained by Seller, within ten (10) days after Seller's satisfaction of the Primary Condition Precedent, Seller will deliver to Purchaser true and complete copies of: (i) all Plan documents and all documents or instruments establishing or constituting any related trust, annuity contract or other funding instrument, and any amendments thereto; and (ii) written descriptions of all unwritten agreements relating to the Plans, if any.

-15-

(c)     The administration of all Plans currently maintained by Seller which are "group health plans" within the meaning of Section 4980B of the Code has been consistent with, and in compliance on a timely basis with, all requirements for reporting, disclosure and continuation of group health insurance under Section 4980B of the Code and ERISA. There are no pending claims or other disputes involving any of the Plans which could have a material and adverse effect on the Stores Business. The benefits provided under each Plan have not been significantly increased by Seller during the ninety days preceding the date hereof.

Section 4.23 Labor Matters.  There is no currently existing collective bargaining or other labor agreement or employment contract, consulting contract or executive compensation agreement (whether written or oral) relating to the Stores Business. Except as disclosed on Schedule 4.23, (i) there are no commitments or understandings for increases in salary, bonuses or other benefits between Seller and any of its employees or agents, (ii) all Employees are employees at will and may be terminated at any time, upon reasonable notice, for any reason or no reason, subject to any applicable Legal Requirements, and (iii) Seller knows of no activities or proceedings of any labor union (or representatives thereof) to organize any unorganized current Employee, or of any strikes, slowdowns, work stoppages, lockouts, or threats thereof, by or with respect to any Employee

Section 4.24 Disclosure.  No representation or warranty made by Seller herein or in any statement, certificate or document furnished or to be furnished by Seller in connection with the transactions contemplated hereby, and no information disclosed in the schedules and exhibits hereto supplied by Seller, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading.

ARTICLE V

Representations and Warranties of Purchaser

Purchaser makes the following representations and warranties to Seller:

Section 5.1 Corporate Status and Authority of Purchaser.

(a)     Purchaser is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas. Purchaser has all requisite corporate power and authority to own and operate its properties and assets and to carry on its business as presently conducted. Purchaser has all requisite corporate power and authority to execute and deliver this Agreement and the other Operative Documents to which it is a party and to perform its obligations hereunder and thereunder, and the execution, delivery and performance of this Agreement and the other Operative Documents to which it is a party have been duly authorized by all necessary corporate action on the part of Purchaser.

(b)     Except as otherwise set forth in this Agreement, the execution and delivery of this Agreement and the Operative Documents by Purchaser, the consummation of the

-16-

transactions contemplated hereby or thereby, and compliance with or fulfillment of the terms and provisions of this Agreement and the Operative Documents by Purchaser: (i) will not require any authorization, consent, approval, license, exemption of or filing or registration with any Governmental Entity or other third party except such as shall have been lawfully and validly obtained prior to the Closing, (ii) will not cause Purchaser to violate or contravene any Legal Requirement, (iii) will not violate or be in conflict with, result in a breach of or constitute (with or without notice or lapse of time or both) a default under, any material agreement, lease or instrument, commitment or arrangement to which Purchaser is a party or by which Purchaser is bound or affected, or give any party with rights under any such material agreement, lease or instrument, commitment or arrangement the right to terminate, modify or otherwise change the rights or obligations of Purchaser thereunder, and (iv) will not violate or contravene any provision of Purchaser's Articles of Incorporation or Bylaws. Purchaser is not subject to any restriction of any kind or character which prohibits Purchaser from entering into this Agreement or the Operative Documents or would prevent the performance of or compliance with all or any part of this Agreement or the Operative Documents or the consummation of the transactions contemplated hereby.

Section 5.2 Enforceability. This Agreement does, and each of the other Operative Documents when executed and delivered shall, constitute a legal, valid and binding obligation of Purchaser enforceable in accordance with its terms as to Purchaser subject to bankruptcy, insolvency, reorganization and other laws and judicial decisions of general applicability relating to or affecting creditors' rights and to general principles of equity.

Section 5.3 Broker. All negotiations relating to this Agreement and the transactions contemplated hereby have been conducted without the intervention of any Person acting on behalf of Purchaser in such a manner as to give rise to any valid claim against Seller for any broker's or finder's commission, fee or similar compensation.

Section 5.4 Funding. Purchaser has, and shall have at Closing, the funding necessary to consummate the transactions contemplated by this Agreement.

ARTICLE VI

Covenants and Certain Actions of the Parties

Section 6.1 Certain Obligations of Seller.

Section 6.1.1 Conduct of Business, etc. From the date of this Agreement until the earlier of the Closing or any termination of this Agreement pursuant to the provisions hereof ("Interim Period"), except to the extent Purchaser shall have given its prior written consent to do otherwise, Seller shall:

(i)     except as disclosed in Schedule 6.1.1, and except as limited by or as otherwise provided in the following provisions of this Section 6.1.1, carry on the Stores Business in

-17-

the ordinary course and in the same manner in which it is being conducted on the date hereof, maintain the Inventory levels and product mix at normal levels and pricing consistent with current practice and preserve its relationships with Governmental Entities, customers, suppliers and others having business dealings in connection with the Stores Business;

(ii)    maintain all qualifications of Seller (including Permits) which are required for it to own or lease the respective Properties or to carry on the Stores Business in accordance with Section 6.1.1(i);

(iii)    refrain from selling or otherwise transferring title to any of the Assets other than in the ordinary course of the Stores Business;

(iv)    maintain in a manner consistent with good industry standards   all Equipment and Improvements, including roofing and other structural aspects, in good working condition and repair sufficient to operate the Stores Business as presently operated by Seller, provided that, where necessary, consistent with good industry standards, required by Legal Requirements and/or Seller is required to do so pursuant to an Existing Lease or other Contract; Seller shall replace such Equipment and Improvement in a manner consistent with good industry standards;

(v)    to the extent within the control of Seller, refrain from doing any act or omitting to do any act which would cause any of the representations and warranties of Seller contained herein not to be true and correct in any material respect if such representations and warranties were made immediately after such act or failure to act; and

(vi)    not enter into any agreement to extend, modify or renew any Assumed Contracts, Existing Leases and/or Third Party Sublease without Purchaser's advance written consent.

Section 6.1.2 Access to Records, Assets and Personnel.

(a)    During the Interim Period, Seller shall give, or cause to be given, to Purchaser and its employees, agents and representatives, reasonable access, during normal business hours and at Purchaser's cost and expense, to such Records as Purchaser may reasonably request. Seller shall permit Purchaser, at Purchaser's cost and expense, to make copies of such Records as desired by Purchaser. All environmental Records shall, to the extent reasonably feasible, be maintained in one central location.

(b)    During the Interim Period, provided Purchaser has given Seller reasonable prior written notice thereof, Purchaser and its employees, agents and representatives shall have the right, at Purchaser's cost and expense, to enter the Properties at any reasonable time during normal business hours to visually inspect the Assets or to conduct and/or oversee the Environmental Tests and Environmental Repairs pursuant to Article X herein. Purchaser shall use reasonable efforts to conduct such activities in a manner so as to minimize any interference with the Stores Business.

(c)    During the Interim Period, Purchaser shall have the right, at its cost and expense, to interview the Employees provided that such interviews (i) are conducted in a professional manner at one of Seller's offices, or at a location (such as a hotel) away from any Property, and (ii) are conducted in a manner so as to minimize any interference with the Stores Business. Purchaser will notify Seller prior to, and will consult with Seller concerning, the substance of, any general correspondence with or to the Employees.

### Section 6.1.3  Hart-Scott-Rodino

(a)    Seller shall, if required by the applicable provisions of the Hart-Scott-Rodino Act, within fifteen (15) days after Seller's satisfaction of the Primary Condition Precedent, prepare and submit to the Federal Trade Commission and the Department of Justice, in a timely manner, all filings required of Seller to commence the "waiting period" under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations of the Federal Trade Commission promulgated thereunder (collectively, the "Hart-Scott-Rodino Act") in connection with the transactions contemplated by this Agreement.

(b)    If a request for additional information is made of Seller pursuant to the Hart-Scott-Rodino Act, Seller shall comply with such request as soon as practicable after receipt of such request.

### Section 6.1.4  Casualty and Condemnation.

(a)    Seller shall bear the risk of condemnation and the risk of loss, damage or destruction of the Properties by fire or otherwise ("Casualty") prior to Closing.

(b)    If any Property is damaged by a Casualty prior to the Closing, Seller shall notify Purchaser of same in writing immediately. Such notice shall specify with particularity the loss or damage incurred, the cause thereof, if known or reasonably ascertainable, a good faith estimate by a reputable independent third party, reasonably approved in advance by Purchaser, of the cost to repair or rebuild such damage on the particular Property and the action Seller proposes to take with respect thereto. Purchaser shall have the option to either (i) elect to have Sellers repair or rebuild the Property, at Seller's expense, to a condition reasonably satisfactory to Purchaser or (ii) reduce the Purchase Price by the amount necessary to repair such damage as reflected in the estimate provided above (irrespective of whether covered by insurance proceeds) and this transaction shall be closed as to such Property; provided that, to the extent operations are substantially impacted due to such damage, the lease/rental payments for such respective New Lease Property shall be abated totally until the repairs and/or rebuilding have been completed.

(c)    If prior to the closing any Property has been condemned, is subject to a condemnation action, or is threatened by a condemnation action which, in Purchaser's reasonable opinion would have a material and adverse effect on a Property or the Stores Business at the Property, then Purchaser shall have the option to (i) terminate this Agreement as to any such Property and reduce

-19-

the Purchase Price in accordance with the provisions of Section 3.2(c) or (ii) equitably reduce the Purchase Price with respect to such Property, taking into account the probable amount of condemnation proceeds, the party to whom such proceeds are to be paid, the cost of restoring the Property, the damage to the Property and the business therein, and the party obligated to make such restoration. Notwithstanding the foregoing, any proceeds (except for reimbursement of costs actually incurred, or to be incurred, by Seller prior to Closing) actually received by Seller during the Interim Period as a result of any condemnation of any Property which does not have a material and adverse effect on a Property shall be, at Purchaser's option at the Closing, (i) retained by Seller and the Purchase Price reduced by the amount of the proceeds retained by Seller or (ii) paid by Seller to Purchaser and the Purchase Price shall not be reduced.

Section 6.1.5  Sales Taxes and Other Taxes Due Prior to the Effective Time.  Seller agrees to prepare and timely file all sales and franchise tax returns with respect to sales to third Persons occurring in connection with the Stores Business on or before the Effective Time, and Seller shall timely pay all sales and franchise taxes applicable to the sales reported on such tax returns. In addition, subject to the other provisions of this Agreement, Seller shall be responsible for and pay all other Taxes (other than the Transaction Tax Amount) related to the Assets and the Stores Business on or prior to the Effective Time.

Section 6.1.6  No Solicitation of Sale or Disclosure.  Except for Seller's required disclosure to Marathon Oil Company to satisfy Seller's Primary Condition Precedent set forth in Section 7.4.8, during the Interim Period neither the Seller nor its Affiliates, agents or brokers will (i) furnish any information concerning the Assets or Stores Business to any Person other than Purchaser other than as required or permitted hereunder, or (ii) initiate, continue, solicit, entertain or consider any other proposal or offer, regarding the sale or other disposition of the Assets or the Stores Business or any part thereof, to any other Person.

Section 6.1.7  Payment of Liabilities.  Except as otherwise explicitly provided in this Agreement, Seller hereby agrees to pay when due all of its respective liabilities and obligations that relate to the Assets or the Stores Business and that arose out of or in any way relate to any action, event or omission occurring prior to the Closing Date.

Section 6.1.8  Consents; Permits.  During the Interim Period, Seller shall, in addition to satisfying the Primary Condition Precedent in Section 7.4.8, (i) obtain all consents (including Landlord Consent and Estoppel Certificates required to assign the Existing Leases any Subordination Agreements (as hereinafter defined) or other consents required to assign Assumed Contracts to Purchaser), approvals, authorizations or orders necessary for Seller to consummate the transactions contemplated hereby, and (ii)  at Purchaser's request, take all action, including the execution of applications and other documents as shall reasonably be requested by Purchaser in order to facilitate the full and expeditious transfer, assignment, procurement or renewal of all Permits necessary or desirable for the operation of a convenience store or other business on each of the Properties by Purchaser and the lease of each of the Properties hereunder; provided that Purchaser shall reimburse Seller for all reasonable costs and expenses reasonably incurred by Seller in connection with clause (ii)

of this Section 6.1.8. Seller shall be responsible for any payments required by the Existing Leases or the lessors under the Existing Leases in connection with obtaining any Landlord Consent and Estoppel Certificates or Subordination Agreements.

Section 6.1.9 Withholding, Social Security and Unemployment Insurance Taxes. Seller shall pay or make all required deposits for, all withholding, social security and unemployment insurance taxes relating to Employees through the Effective Time for each Property and shall file timely quarterly and annual reports for such taxes due through such date in accordance with applicable Legal Requirements.

Section 6.1.10 Notification. During the Interim Period, Seller will promptly notify Purchaser in writing, if Seller becomes aware of any fact or condition that causes or constitutes a breach or threatened breach of any of Seller's representations and warranties made as of the date of this Agreement, or if such Seller becomes aware of the occurrence after the date of this Agreement of any fact or condition that would (except as expressly contemplated by this Agreement) cause or constitute a breach or threatened breach of any of such representation or warranty had such representation or warranty been made as of the time of occurrence or discovery of such fact or condition. Should any such fact or condition require any change in the appropriate schedule, if such schedule were dated the date of the occurrence or discovery of any such fact or condition, Seller will promptly deliver to Purchaser a supplement to the appropriate schedule specifying such change. During the same period, Seller will promptly notify Purchaser of the occurrence of any breach or threatened breach of any covenant of Seller in this Article VI or of the occurrence of any event that may make the satisfaction of the conditions in Article VII impossible or unlikely.

Section 6.1.11 Certificate of Occupancy. Seller shall diligently pursue the completion of construction of the store (store number 20) located on the Property at County Line and the obtaining of the certificate of occupancy prior to the Closing Date ("Required C. O. ").

Section 6.1.12 Food Service Obligations. The parties acknowledge that (i) the Seller currently operates various fast food franchises within some of the convenience stores located at the Properties, including Blimpie's, Church's, and others (collectively, the "Food Service Companies"), (ii) at Seller's request Purchaser will operate the fast food services on an interim basis until Purchaser has remodeled the affected stores, the timetable for which is uncertain at the present time, and (iii) the contracts from such Food Service Companies contain numerous onerous provisions which are not acceptable to Purchaser. Seller covenants that, prior to closing, Seller will obtain written commitments in a form satisfactory to Purchaser, in Purchaser's sole judgment, from each of the Food Service Companies, permitting Purchaser to operate such fast food services on an interim basis only and on terms acceptable to Purchaser (collectively, the "Food Service Commitments"). Seller shall be obligated to pay any fees or expenses required to obtain such Food Service Commitments and any damages, costs and expenses resulting from Seller's termination of its agreements with Food Service Companies. Purchaser shall cooperate with Seller to obtain the Food Service Commitments provided that Purchaser will not be required to expend any money in connection with the obtaining of the Food Service Commitments.

-21-

FILED: JULY 30, 2008

08CV4336

JUDGE LEINENWEBER

MAGISTRATE JUDGE NOLAN


JFB

Section 6.1.13 <u>Reasonable Efforts</u>. During the Interim Period, Seller shall use Reasonable Efforts to cause the covenants in this Article VI and the conditions in Article VII to be satisfied.

### Section 6.2 <u>Certain Obligations of Purchaser</u>.

#### Section 6.2.1 <u>Hart-Scott-Rodino</u>.

(a)    Purchaser shall, if required by the applicable provisions of the Hart-Scott-Rodino Act, within fifteen (15) days after Seller's satisfaction of the Primary Condition Precedent, prepare and submit to the Federal Trade Commission and the Department of Justice, in a timely manner, all filings for Purchaser required to commence the "waiting period" under the Hart-Scott-Rodino Act in connection with the transactions contemplated by this Agreement.

(b)    If a request for additional information is made of Purchaser pursuant to the Hart-Scott-Rodino Act, Purchaser shall comply with such request as soon as practicable after receipt of such request.

#### Section 6.2.2 <u>Employment Offers</u>.

(a)    Subject to the availability of the Employees due to applicable Legal Requirements, Purchaser shall interview substantially all of the Employees at or below the level equivalent to Purchaser's field consultant level and make offers of employment conforming to the requirements of Section 6.2.2(b) (which will be effective as of the Effective Time) to such Employees as Purchaser may desire. In addition, Purchaser agrees to interview Ginnell Tingle for positions with Purchaser which are available as of the Closing Date; provided that the salary in any offer of employment which may be extended to Ginnell Tingle would be comparable to her salary as of the date hereof. Not less than thirty (30) days prior to the Closing, Seller shall provide Purchaser with a listing consisting of Ginnell Tingle and all of Seller's Employees who work in connection with the Properties or the Stores Business at or below the level equivalent to Purchaser's field consultant level, which listing shall include the Employee's name, social security number, hourly rate or biweekly salary, annual earnings, date of hire and job title. In the case of Employees who are on a leave of absence, the Seller shall also designate on such listing the date upon which the leave of absence began and the expected expiration date of the leave of absence. Purchaser shall notify Seller ten (10) days prior to the Closing Date of the names of the Employees offered employment with Purchaser ("Successor Employees").

(b)    Purchaser agrees that any employment offers it elects to make shall include, at a minimum, the following:

(i)    except with respect to (a) any Employees at the level equivalent to Purchaser's field consultant and (b) Ginnell Tingle, a job or position having responsibilities substantially similar to the job or position held by such Employee immediately prior to the Closing, and

(ii)    benefits as set forth in Schedule 6.2.2(b) (ii); provided that each offer extended shall provide that such Employees shall receive credit for all years of service with Seller for purposes of qualifying for such benefits offered by Purchaser.

(c)    at Closing, Seller shall pay to the Successor Employees any bonus payments, if any, accrued in favor of each such Successor Employee as a result of service completed prior to the Closing Date if owed in accordance with Seller's policy. At Closing, Seller shall pay to each Successor Employee an amount equal to accrued but unused vacation pay (and sick pay and paid personal leave, if any) owed to such Successor Employee as of the Closing Date, in accordance with Seller's policy.

(d)    Nothing herein is intended to obligate the Purchaser to employ any Employee or to incur any obligation to pay any amounts in connection with any obligations to any Successor Employee arising or accruing for any period prior to the Closing Date.

### Section 6.2.3   Purchaser's Review of Surveys and Title Policies.

(a)    Seller will, within five (5) days after Seller's satisfaction of the Primary Condition Precedent, place orders through Title Company for (i) preliminary title documentation (collectively, the "Title Commitments") for ALTA (1990) Extended Coverage leasehold, title insurance policies with liability equal to the applicable Assigned Value for each New Leased Properties or Existing Leased Property, as the case may be (collectively, the "Title Policies"), insuring good and marketable title in Purchaser to the New Leased Properties or Existing Leased Properties, as the case may be, subject in each case only to the Permitted Real Property Encumbrances, and (ii) current as-built surveys for the New Leased Properties and Existing Leased Properties in a form acceptable to the Title Company and Purchaser ("Surveys"). Seller shall pay all charges by Title Company with respect to its issuance of the Title Commitments and Title Policies. Purchaser shall pay all costs in connection with the Surveys.

(b)    Within twenty (20) days after Purchaser's receipt of surveys and the Title Commitment and all documents evidencing exceptions to title described in the Title Commitments, for a given New Leased Property or Existing Leased Property, as the case may be ("Examination Period"), Purchaser will notify Seller if Purchaser has any title objections with respect to such New Leased Property or Existing Leased Property, as the case may be (any title objections shall hereinafter be collectively referred to as the "Title Objections"). Seller agrees to make Reasonable Efforts to cure such Title Objections within ten (10) days after notification to Seller by Purchaser of the Title Objections and to notify Purchaser of the curative matters. Purchaser shall have ten (10) additional business days to examine any curative matters. To the extent Seller is unable to satisfactorily cure any Title Objections with respect to any New Leased Property or Existing Leased Property, as the case

may be, as set forth above, Purchaser may, as its sole remedy, either (i) waive such Title Objection and reduce the Purchase Price by the amount reasonably necessary in Purchaser's good faith opinion, in consultation with Seller, to cure such Title Objection, or (ii) subject to Section 3.2(c), treat such New Leased Property or Existing Leased Property as a Rejected Property. Any title matters which are not objected to by Purchaser, or are objected to and cured (or not cured but are waived by Purchaser as set forth above), shall be deemed "Permitted Real Property Encumbrances". For purposes of this Section 6.2.3(b), the failure to cure the Primary Condition Precedent pursuant to Section 7.4.8 shall, in addition to any other consequence set forth in such section, be deemed to be a Title Objection as to the affected Properties.

Section 6.3 Determination of Purchase Price Components.

Section 6.3.1 Physical Inventory - Merchandise Inventory. A physical inventory (the "Physical Inventory") will be taken of the Merchandise Inventory which is held for resale to customers located at each Store on the Closing Date. The Physical Inventory shall be conducted by an inventory service mutually acceptable to Seller and Purchaser ("Inventory Service") and shall, be overseen by representatives of Seller and Purchaser. Each party shall pay one half of the fees owed to such inventory service and each party shall be responsible for all other fees incurred by such party with respect to the Physical Inventory. Out-of-code, obsolete or damaged merchandise shall not be counted as part of the Physical Inventory and shall not be purchased by Purchaser. Any such out-of-code, obsolete or damaged merchandise shall be deemed to be Excluded Assets. The Merchandise Inventory shall be purchased at sixty five percent (65%) of Seller's normal retail price for such Merchandise Inventory; provided, however, that Merchandise Inventory consisting of cigarettes shall be purchased at Seller's actual net cost, taking into account all discounts and allowances. The amount to be paid by Purchaser for the Merchandise Inventory shall be referred to as the "Merchandise Inventory Price".

Section 6.3.2 Physical Inventory - Motor Fuels Inventory. At the time of the Store Transition, on the Closing Date, Seller shall take and Purchaser (acting through its employees and agents) or the Inventory Service may observe Seller's taking of, appropriate stick readings of all Motor Fuels Inventory contained in the underground storage tanks, which readings shall be adjusted to reflect any water actually contained in such tanks. Purchaser shall purchase such Motor Fuel Inventory at Seller's actual documented cost taking into account all discounts and allowances; provided that, such costs shall then be adjusted to include all applicable excise and fuel taxes paid thereon by Seller ("Motor Fuels Inventory Price").

Section 6.3.3 Physical Inventory - Supplies.   A physical inventory ("Food-Related Supplies Inventory") shall be taken of those Supplies not packaged for individual resale but pertaining to products for resale such as any soft drink mix, cups, napkins, straws, bags, syrups, bowls, deli food items (including items used in connection with the Blimpie's, Noble Roman's Pizza and/or Church's operations), condiments, coffee beans or packages, cheeses, breads and similar items (collectively, "Food-Related Supplies") at the same time and in a manner similar to the Physical Inventory conducted pursuant to Section 6.3.1 above. Purchaser shall purchase such Food-Related Supplies at Seller's actual cost taking into account all discounts and allowances. Additionally, Purchaser shall purchase

-24-

at a flat fee of $100 per store all non Food-Related Supplies such as pricing guns, calculators, brooms, mops and cleaning supplies.

Section 6.3.4 Physical Inventory - Cash on Hand. Notwithstanding anything in this Agreement to the contrary, all cash, whether at the Properties or in transit to or from any bank, at the Effective Time shall remain the property of Seller; provided that (i) for each Property at which there is an operating convenience store, Purchaser shall retain the sum of $1,000.00 on the immediate premises and (ii) Purchaser shall pay to Seller on the Closing Date an amount which represents the aggregate of all sums so retained at such Properties in accordance with the foregoing ("Change Fund").

Section 6.4 Store Transition Procedure. No later than ten (10) days prior to Closing, Seller and Purchaser will agree upon a store transition procedure which shall be implemented on the Closing Date separate and apart from the Physical Inventories, to transition each individual property from operation by Seller to operation by Purchaser ("Store Transition"). The Store Transition procedure will include the following:

(i)     a final "ring out" of all registers and removal of all cash (except for the Change Fund), checks, coupons and food stamps from the register;

(ii)    changing over the lottery terminals to Purchaser's terminals and Purchaser's scratch tickets and removal of all scratch tickets owned by Seller;

(iii)   removal of all money from safes, excluding any amount comprising part of the Change Fund;

(iv)    sign out by Seller's employees on their time sheet;

(v)     an inventory of the major items of Equipment and their condition;

(vi)    performing the stick readings of the Motor Fuels Inventory as provided in Section 6.3.2; and

(vii)   such additional items as may be agreed to by Purchaser and Seller.

After completion of the Store Transition procedure, the representatives of Seller and Purchaser shall execute a document evidencing the time of such completion and, as of such time, the operation of the stores shall be transferred from Seller to Purchaser. The time at which the transfer takes place shall be recorded and shall be considered the "Effective Time" for purposes of that particular Property.

Section 6.5 Removal of Excluded Assets. Seller shall remove all Excluded Assets from each Property no later than the Effective Time with respect to such Property. Any Excluded Assets not removed by that time shall be deemed abandoned by Seller, and Purchaser may dispose of such

Excluded Assets in whatever manner Purchaser may elect. Seller shall reimburse Purchaser for any reasonable costs or expenses incurred by Purchaser in connection with such disposition.

Section 6.6 Closing Date Real Property Proration Amount

(a) Except as provided below, Purchaser and Seller shall allocate between them as of the date of the Closing: (i) all Third Party Lease income with respect to any Property being transferred, (ii) real estate property taxes, (iii) security deposits, (iv) utility and maintenance expenses related to the normal maintenance, operation and repair of any Property, including gas, electricity and water charges and (v) rent payable under any Existing Lease, as described below (collectively, the "Closing Date Real Property Proration Amount"). Said utility charges will be prorated on the basis of actual use to the Closing, if possible, otherwise on the basis of the last billing.

(b) Rent payable (including any percentage rental owed) under each Existing Lease shall be prorated between Purchaser and Seller as of the date of the Closing for each such Existing Lease. Delinquent rent of any sort shall not be prorated and Seller shall pay, prior to Closing, the same, including any penalties, interest or late charges thereon.

Section 6.7 AC Proration Amount. The "AC Proration Amount" is the net amount of all charges, fees or payments under Assumed Contracts for which Seller is responsible or are payable to Seller which (i) have accrued for periods preceding the Closing Date but have not been paid or (ii) have been paid in advance for periods occurring after the Closing Date. The calculation of the AC Proration Amount will be determined by mutual agreement between Seller and Purchaser and will be made based on the best information relating to the items covered thereby which is available immediately prior to the Closing Date.

Section 6.8 Memorandum of Purchase and Sale Agreement. At any time after the Seller's satisfaction of the Primary Condition Precedent, Seller may record a Memorandum of Purchase and Sale Agreement in the form attached as Schedule 6.8 against the title of each New Leased Property.

## ARTICLE VII

### Conditions Precedent

Section 7.1 Preamble. The respective obligations of Seller and Purchaser set forth herein regarding the consummation of the transactions contemplated by this Agreement and the other Operative Documents shall be subject to the fulfillment, on or before the Closing Date, in the case of Seller, of the conditions set forth in Sections 7.2 and 7.3, and in the case of Purchaser, of the conditions set forth in Sections 7.2 and 7.4. Any of the following conditions may be waived in whole or in part in writing by the party whose obligation to perform at the Closing is subject to such condition; provided that, such waiver shall not be deemed a waiver of any liability the other party hereto may have hereunder with respect to the event or condition causing such condition not to be satisfied at Closing.

## Section 7.2 Mutual Conditions to Obligation of Seller and Purchaser.

Section 7.2.1 Hart-Scott-Rodino Compliance. Any applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall have expired or been terminated.

Section 7.2.2 Absence of Litigation. No order, stay, judgment or decree (excluding any of the same relating to any action, suit or proceeding instituted by Seller or Purchaser against the other party hereto) shall have been issued and be in effect by any court restraining or prohibiting the Closing and no action, suit or proceeding (excluding any of the same instituted by Seller or Purchaser against the other party hereto) shall be pending (or threatened by any Governmental Entity) seeking to restrain or prohibit (or questioning the validity or legality of) the consummation of the transactions contemplated by this Agreement or seeking damages in connection therewith.

## Section 7.3 Conditions to Obligations of Seller.

Section 7.3.1 Representations and Warranties of Purchaser. The representations and warranties of Purchaser in Article V, individually and collectively, shall be true and correct in all material respects at and as of the Closing with the same effect as though made at and as of the Closing without giving effect to any supplemental disclosures made during the Interim Period. Purchaser shall have duly performed and complied in all material respects with all agreements contained herein required to be performed or complied with by Purchaser at or before the Closing.

Section 7.3.2 Officers Certificate. Purchaser shall have delivered to Seller a certificate of the Purchaser, dated as of the Closing Date and signed by its Chairman, President or any Vice President, as of the fulfillment of the conditions described in Section 7.3.1.

Section 7.3.3 Actions at Closing. Purchaser shall have taken all of the actions required to be taken by it at the Closing pursuant to Article VIII.

## Section 7.4 Conditions to Obligations of Purchaser.

Section 7.4.1 Representations and Warranties of Seller. The representations and warranties of Seller in Article IV, individually and collectively, shall be true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing with the same effect as though made at and as of the Closing without giving effect to any supplemental disclosures made during the Interim Period. Seller shall have duly performed and complied in all material respects with all agreements contained herein required to be performed or complied with by Seller at or before the Closing

Section 7.4.2 Officer's Certificate. Seller shall have delivered to Purchaser a certificate of Seller, dated as of the Closing Date and signed by its Chairman, President or Vice President, as to the fulfillment of the conditions described in Section 7.4 1.

-27-

Section 7.4.3 Actions at Closing. Seller shall have taken all of the actions required to be taken by Seller at the Closing pursuant to Article VIII.

Section 7.4.4 Removal of Liens. All Liens (other than the Permitted Real Property Encumbrances) affecting any Asset shall have been released of record and satisfied in full by Seller, all in form and substance satisfactory to Purchaser and its counsel.

Section 7.4.5 Consents.

(a)    Seller shall have obtained and delivered to Purchaser from each lessor (i) under each Existing Lease for which consent to Seller's assignment of any Existing Lease to Purchaser is required, a consent certificate in substantially the form attached hereto as Schedule 7.4.5(i), consenting to the assignment of its respective Existing Lease to Purchaser and certifying such matters set forth therein, and Purchaser shall have approved of any matters disclosed therein ("Landlord Consent and Estoppel Certificate") and (ii) a Subordination and Attornment Agreement from each mortgagee holding a Lien on any New Leased Property or Existing Leased Property substantially in the form attached hereto as Schedule 7.4.5(ii) ("Subordination Agreement"). Seller shall be responsible for any payments required by the Existing Leases or the lessors under the Existing Leases in connection with obtaining the Landlord Consent and Estoppel Certificates and Subordination Agreements.

(b)    Seller shall have obtained and delivered to Purchaser any necessary consents, in form and content satisfactory to Purchaser and its counsel, to the assignment to Purchaser of all Assumed Contracts and Third Party Subleases.

(c)    Seller has delivered to Purchaser the Food Service Commitments fully executed by the respective Food Service Companies, in a form satisfactory to Purchaser, in Purchaser's sole judgment.

Section 7.4.6 Permits. All Permits necessary or desirable for Purchaser's operation of its customary 24-hour convenience store operation (including the sale of motor fuels, if applicable) following the Closing shall have been validly and legally transferred to Purchaser, or obtained by or on behalf of Purchaser, including but not limited to, Lottery License Permits.

Section 7.4.7 Seller's Principal. Seller shall have caused Seller's Principal to take all action required of Seller's Principal in this Agreement.

Section 7.4.8 Seller's Satisfaction of Primary Condition Precedent. Seller has disclosed to Purchaser that Seller has certain obligations and the Assets are encumbered by certain restrictions that Seller has granted in favor of Marathon Oil Company ("Marathon"). Seller and Purchaser shall not be obligated to perform any act required of it by this Agreement, nor shall Seller or Purchaser be deemed to be in default or breach of any provision of this Agreement as a result of any such failure to

-28-

perform, and Seller is not entitled to the benefit of any rights which would be otherwise available to it under this Agreement unless and until Seller has satisfied, at its sole expense, the Primary Condition Precedent which is the receipt of a written statement from Marathon, satisfactory in all respects to Purchaser, stating for Marathon and its predecessors, successors, assigns and representatives that Marathon has released Seller and the Assets from each and every right, claim, option and interest Marathon has or may have in the future, affecting the Assets in any way. In addition to the foregoing, the written release of the rights, claims, options and interests of Marathon shall be in a form necessary to provide Purchaser with the Title Commitment required by Section 6.2.3(b) of this Agreement without any exception to coverage by the Title Company for any Property because of any right, claim, option or interest of Marathon. Seller's failure to obtain Marathon's release of every right, claim, option and interest by Marathon to Purchaser's satisfaction within sixty-six (66) days of the date of this Agreement shall entitle Purchaser to terminate this Agreement and/or exercise in whole or in part any other right or remedy available to it under the Agreement.

## ARTICLE VIII

### Closing: Certain Post Closing Obligations

Section 8.1 Closing. The closing of the transactions contemplated hereby ("Closing") shall take place at the offices of Purchaser at 2711 N. Haskell Ave., Dallas, Texas, on the later to occur of (i) the thirty fifth (35th) day after all Title Commitments and Surveys in substantially completed form have been furnished to Purchaser pursuant to Section 6.2.3(a), (ii) the twentieth (20th) day after all Environmental Reports have been received by Purchaser, (iii) ten (10) days after all Environmental Repairs have been completed, or (iv) February 15, 1998, unless another time, date and place is agreed to in writing by the parties; provided, subject to Section 12.1, either Purchaser or Seller may extend the date set forth in clause (iv) above for one period of not more than twenty (20) days, if all of its conditions precedent set forth in Article VII have not been satisfied or waived. The date Closing occurs hereunder is referred to herein as the "Closing Date". At the Closing the following events shall occur, each event being deemed to have occurred simultaneously with the other events except as otherwise specifically provided below:

(a) Seller and Purchaser shall execute and deliver a General Assignment, Bill of Sale and Assumption Agreement ("General Assignment") in the form of Schedule 8.1(a) covering the Assumed Contracts, Merchandise Inventory and Motor Fuels Inventory, Equipment, Supplies, Personal Property and the Records; provided, it is agreed that the description of the Assets to be transferred pursuant to the General Assignment and this Agreement shall be appropriately modified and amended to reflect dispositions and acquisitions of the Assets after the date hereof in accordance with the provisions of this Agreement.

(b)    Purchaser shall pay to Seller the portion of the Adjusted Purchase Price due and payable on the Closing Date pursuant to Article III, and to Seller's Principal the Non-Competition and Consulting Amount by wire transfer in immediately available funds, to accounts designated by Seller and Seller's Principal, respectively, not later than 2:00 p.m Central Time on the Closing Date.

(c)    Purchaser shall execute and deliver to Seller a Promissory Note in the amount of $3,500,000 in the form attached hereto as Schedule 8.1(c) (the "Promissory Note").

(d)    Seller and Purchaser shall execute and deliver assignments in the form attached hereto as Schedule 8.1(d) pursuant to which Purchaser shall be assigned (i) the Existing Leases and Third Party Subleases, (ii) all of Seller's right, title and interest in any Improvements located on such Properties and (iii) any claims or rights which Seller may have against any predecessor-in-interest or any Third Person (including, but not limited to, any Governmental Entities) with respect to such Properties.

(e)    Seller and Purchaser shall execute and deliver individual leases in the form attached hereto as Schedule 8.1(e) pursuant to which Purchaser will lease from Seller and Seller will lease to Purchaser (i) each of the New Leased Properties, and (ii) all of Seller's right, title and interest in any Improvements located on such Properties, and will assign any claims or rights which Seller may have against any predecessor-in-interest or any Third Person (including, but not limited to, any Governmental Entities) with respect to such New Leased Properties.

(f)    Seller shall instruct Title Company to record the Memorandum of Option to Lease or Purchase in the form attached hereto as Schedule 8.1(f) to record Seller's grant to Purchaser of the rights to lease or purchase all property adjacent to the Properties which Seller owns or leases as of the execution date of this Agreement. The Adjacent Properties are shown on Schedule 8.1(f)(i).

(g)    Seller shall make available possession of, and Purchaser shall accept, the Assets, and Purchaser shall assume the Assumed Liabilities, pursuant to the General Assignment.

(h)    Seller shall instruct the Title Company to record memoranda of lease with respect to each lease of the New Leased Properties to Purchaser and the assignments of each Existing Lease in the forms attached hereto as Schedules 8.1(h)(i) and 8.1(h)(ii), and such other instruments executed and delivered at the Closing as the parties shall deem necessary, and to issue and deliver to Purchaser the Title Policies.

(i)    Purchaser shall deliver to Seller a properly completed resale exemption certificate for all Merchandise Inventory.

(j)    Purchaser shall have remitted to Seller any sales or use taxes applicable as a result of consummation of this Agreement, which amount of such taxes shall have been agreed

upon by Seller and Purchaser, each acting in good faith, prior to Closing based on the best available information relating thereto ("Transaction Tax Amount").

(k)    Seller shall have delivered to Purchaser a tax clearance letter from the appropriate Governmental Entities satisfactory in form and substance to Purchaser evidencing that Seller has paid all sales taxes for all sales occurring prior to the Closing Date.

(l)    Seller's Principal and Purchaser shall execute and deliver the Non-Competition and Consulting Agreement in the form attached hereto as Schedule 8.1(l).  The amount to be paid to Seller's Principal thereunder shall be referred to as the Non-Competition and Consulting Agreement Amount.

(m)    Seller shall use its best efforts to cause each of Seller's Principal's children and Seller's Principal's wife to execute and deliver non-competition agreements in the form attached hereto as Schedule 8.1(m).  The amounts to be paid and the timing of such payments shall be as set forth in such agreements.

(n)    Seller and Purchaser shall execute and deliver a trademark assignment agreement and such other transfer documents in form and content satisfactory to Purchaser and Seller to transfer the Proprietary Rights to Purchaser.

(o)    Seller and Purchaser shall execute and deliver a trademark license agreement in form and content satisfactory to Purchaser and Seller to permit Seller to use the "red D mart" tradename solely in connection with the Properties located at New Paris and Syracuse (store numbers 28 and 21) and any Rejected Property (the "Excluded Stores").

(p)    Seller shall deliver the properly issued Required C.O. in connection with the Store (Store number 20) located at the Property at County Line.

(q)    Seller and Purchaser shall execute the Remedial Measures Agency Letter (as hereinafter defined).

(r)    Seller shall deliver fully executed Landlord Consent and Estoppel Agreements for each Existing Leased Property and Subordination Agreements for each Existing Leased Property and New Leased Property which is subject to one or more mortgages.

(s)    Seller has delivered to Purchaser the Food Service Commitments fully executed by the respective Food Service Companies, in a form satisfactory to Purchaser, in Purchaser's sole judgment.

(t)    To the extent consistent with the other provisions of this Agreement, Seller shall execute and deliver at Closing such other assignments, conveyances, certificates of title and bills of sale reasonably requested by Purchaser which are necessary in order to satisfy any applicable

-31-

Legal Requirements relating to the transfer of the Assets to Purchaser or which are customarily given in the appropriate jurisdiction to accomplish transfers of assets of the type involved. Such assignments shall also include an assignment of all of Seller's rights under all warranties held by Seller or its Affiliates relating to Equipment or other Assets, to the extent assignable.

Section 8.2 Post Closing Inventory Payments.

(a)    On or prior to three (3) business days after the Closing Date, Seller and Purchaser shall agree on the amount of the Merchandise Inventory Price, the Motor Fuels Inventory Price and the Supplies Price calculated pursuant to Sections 6.3.1, 6.3.2 and 6.3.3. and no later than two (2) business days after such agreement as to amount, Purchaser shall wire transfer the full amount thereof to Seller's Account.   To the extent that the parties cannot agree on the appropriate aggregate amount, Purchaser shall wire transfer any undisputed amount to Seller within the two (2) business days after agreement as to such undisputed amount. The parties will negotiate in good faith to resolve any disagreements with respect to any disputed amounts within fifteen (15) business days after the Closing. If the parties are still unable to agree after such fifteen (15) business day period, the parties agree to appoint a mutually agreeable independent third party to determine the sole issue of the appropriate amount of payment to be made.

(b)    If following the Closing the amount paid by either party with respect to the items and periods covered by the Closing Date Real Property Proration Amount or the AC Proration Amount differs from the amounts used in calculating the Adjusted Purchase Price, then such party shall notify the other of the amount of such difference, and the appropriate party shall pay the other such amount within ten (10) days after such notification.

Section 8.3 Post Closing Motor Fuels Equipment Transfer Notification. Within ten (10) days after the Closing Date, Seller shall (i) file with the appropriate Governmental Entities the appropriate documentation evidencing the transfer of the Motor Fuels Equipment to Purchaser and (ii) provide Purchaser with a copy of any such notification sent to the appropriate Governmental Entities.

Section 8.4 Post Closing Access. From and after the date of the Closing, each party hereto agrees to provide to the other parties and their representatives reasonable access (at reasonable time upon prior notice) to such party's books and records for the purpose of enabling such other party to prepare any tax returns and reports, or to respond to any tax audit or review, relating to the operation of the Assets or the Stores Business. Seller shall preserve until December 31, 1999 all material business, operations and financial records relating to the Assets of the Stores Business and not otherwise delivered to Purchaser hereunder and Purchaser shall preserve until December 31, 1999 all such records so delivered to it. Following December 31, 1999, Seller or Purchaser, as the case may be, shall use reasonable efforts to notify the other party prior to the destruction of such documents then in such party's possession.

Section 8.5 Confidentiality. For a period of two (2) years from the Closing Date, Seller shall, and shall cause its senior level employees, Seller's agents and other representatives to, (a) hold

in confidence all Confidential Information, and (b) not disclose the same to any Person except in connection with this Agreement and otherwise as may be reasonably necessary to carry out this Agreement and the transactions contemplated hereby or as may be necessary to enable Seller to comply with Legal Requirements applicable to Seller, including but not limited to, the filing of tax returns and responding to audit requests. For purposes of this Section 8.5, "Confidential Information" means all proprietary information concerning the Assets or Stores Business which, if disclosed to a competitor of Purchaser, may be detrimental to the operation of the business carried on by Purchaser in connection with the Properties, whether taken as a whole or as individually conducted at a Property, except information which constitutes readily ascertainable public information, including without limitation any information filed with the Securities and Exchange Commission or other Governmental Entities. The provisions of this Section 8.5 shall not apply to any portion of the Confidential Information which (a) becomes generally available to the public other than as a result of a disclosure by Seller, or (b) Seller becomes legally obligated to disclose other than due to voluntary actions by Seller (in which case Seller shall nevertheless in good faith attempt to obtain confidential treatment for such information)

Section 8.6 Non-Competition Covenant. For a period of five (5) years from and after the Closing, other than in connection with the Excluded Stores, neither Seller nor any Person controlled (as such term is used in the definition of "Affiliate") by Seller shall engage, directly, indirectly or through franchisees, licensees or other third Persons, in a retail convenience store business providing groceries and/or gasoline in those cities or counties in which the Properties and any of convenience stores operated by Purchaser are currently located. The foregoing covenant shall not prevent the performance of any maintenance work by Seller or any affiliate of Seller.

Section 8.7 Application of Transaction Tax Amount. Promptly after the Closing, Seller shall properly apply the Transaction Tax Amount towards the payment of all sales and use taxes attributable to the transfer of the Assets to Purchaser.

## ARTICLE IX

### Termination

Section 9.1 Termination. Subject to Section 8.1, this Agreement and the transaction contemplated hereby may be terminated and abandoned:

(i)    at any time prior to the Closing Date by mutual written consent of Purchaser and Seller;

(ii)    by written notice from either Purchaser or Seller to the other party hereto if the Closing shall not have occurred prior to April 15, 1998; provided that the party giving such notice shall not have materially delayed the Closing Date beyond April 15, 1998.

-33-

(iii)   (1) by Purchaser if any of the conditions in Section 7.4 have not been satisfied as of the Closing Date or if satisfaction of a condition is or becomes impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement) and Purchaser has not waived such condition on or before the Closing Date; or (2) by Seller, if any of the conditions in Section 7.3 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with their obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date; or

(iv)   by either party, if a final non-appealable judgment has been entered against such party or its Affiliates restraining, prohibiting, declaring illegal or awarding substantial damages in connection with the transactions contemplated hereby.

Section 9.2 Limitation on Right to Terminate; Effect of Termination.

(a)   A party shall not be allowed to exercise any right of termination pursuant to Section 9.1, if the event giving rise to the termination right shall be due to the failure of such party (or a Person associated therewith) seeking to terminate this Agreement to perform or observe in any material respect any of the covenants or agreements set forth herein to be performed or observed by such party.

(b)   If this Agreement is terminated as permitted under Section 9.1, such termination shall be without liability of or to any party to this Agreement (except pursuant to Sections 4.8 and 5.3), or any shareholder, director, officer, trustee, employee, agent, servant, consultant or representative of such party or any Affiliate; provided, if, any party (or a Person associated therewith) fails to fulfill a condition to the performance of any other party or to perform a covenant of this Agreement or breaches this Agreement and this Agreement is so terminated pursuant to Section 9.1 by the other party, then the rights of the terminating party to pursue all legal remedies will survive such termination, including the right to recover any and all Damages sustained or incurred by the other party in connection with such failure or breach.

(c)   Except as set forth above, each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise and the exercise of a right of termination will not be an election of remedies.

## ARTICLE X

### Environmental

Section 10.1 Testing.

(a)   Within ten (10) days after Seller's satisfaction of the Primary Condition Precedent, Purchaser, as Seller's agent, shall engage the services of NDE/Tanknology or other reputable contractor ("Seller's Environmental Contractor") to conduct precision tests of all Motor Fuels

-34-

Equipment located on or under any of the Properties, including testing of underground storage tanks, lines, leak detectors, automatic tank gauges, if any, and, if requested by Purchaser, stage II testing and cathodic protection testing (collectively, the " Motor Fuels Equipment Tests") in accordance with the protocol approved by Purchaser. The Motor Fuels Equipment Tests shall be performed in accordance with the tank and line tightness testing requirements established in the applicable federal regulations codified at 40 CFR Part 280. The cost of the Motor Fuels Equipment Tests shall be paid by Purchaser. If the Motor Fuels Equipment Tests disclose any leaks in the Motor Fuels Equipment, Purchaser shall promptly advise Seller, and Seller shall immediately (but in any event prior to Closing), at its sole cost and expense, (i) repair any such leaks (or if required by applicable Legal Requirements, replace individual components of the Motor Fuels Equipment) and cause such repaired or replaced individual components to be re-certified as to tightness by Seller's Environmental Contractor and (ii) restore the surface condition of the affected Properties to a condition equal to the condition prior to the repair or replacement (items in (i) and (ii) above, collectively, the "Environmental Repairs"); provided that Seller agrees to discuss with Purchaser any Environmental Repairs to be made prior to making such Environmental Repairs so as to facilitate the installation of any upgrades or other improvements which may be contemplated or desired by Purchaser. Any such additional upgrades or improvements desired by Purchaser would be done at Purchaser's incremental expense (i.e. above the cost of the basic Environmental Repairs to be otherwise performed by Seller hereunder).

(b)    Within ten (10) days after Seller's satisfaction of the Primary Condition Precedent, Purchaser, as Seller's agent, shall also engage the services of ENSR, based out of its Northborough, Massachusetts office (or other nationally recognized firm) ("Purchaser's Environmental Consultant"), to perform (i) tests for the existence of asbestos-containing materials at the Properties ("ACM Tests"), (ii) a Phase I records search in accordance with the protocol set forth in Schedule 10.1(b-1) ("Phase I") and (iii) soil, groundwater and, if applicable, surface water tests in accordance with the protocol set forth in Schedule 10.1(b-1) and/or inspections of any existing remediation systems (collectively, "Phase II Tests"). The cost of the ACM Tests, Phase I and Phase II Tests shall be paid by Purchaser.

(c)    Each party will notify the other in writing at least (i) five (5) days in advance of performing any Motor Fuels Equipment Tests and (ii) fifteen (15) days in advance of performing any Environmental Repairs, so that the other party or its consultant or contractor may be present to observe.

## Section 10.2 Environmental Reports to Purchaser: Notification

(a)    The parties shall instruct Seller's Environmental Contractor and Purchaser's Environmental Consultant, as the case may be, to make written reports of the Environmental Testing and Environmental Repairs described in Section 10.1, and promptly distribute them simultaneously to Seller and Purchaser; provided that all such testing and reports shall be completed and distributed not more than sixty (60) days after Seller's satisfaction of the Primary Condition Precedent ("Environmental Report"). The Environmental Report shall include: (i) copy of

the most recent state underground storage tank registration form, (ii) the results of all ACM Tests, Motor Fuels Equipment Tests, Phase I and Phase II Tests performed, (iii) a description of any and all Environmental Repairs required to be undertaken by Seller pursuant to Section 10.1 to repair any leaks in the Motor Fuel's Equipment revealed by the Motor Fuels Equipment Tests; and/or (iv) certification by Seller's Environmental Contractor stating that, as of the applicable test date, the Motor Fuels Equipment tested tight. Such Environmental Reports should be forwarded periodically as the Environmental Testing or Environmental Repairs are completed; provided that the final Environmental Report for each Property shall include all information generated by Seller's Environmental Contractor or Purchaser's Environmental Consultant, as the case may be, in connection therewith.

(b)    If the ACM Tests, Motor Fuels Equipment Tests and/or Phase II Tests disclose any conditions which are reportable under applicable Legal Requirements, Seller shall timely notify the appropriate Governmental Entities and provide Purchaser with copies of all such notifications.

Section 10.3 <u>Asbestos-Containing Materials</u>. If the ACM Tests reveal the existence of asbestos-containing materials on the Properties (including the Improvements) which are required to be removed, treated, abated or remedied to comply with applicable Legal Requirements, Seller shall engage Purchaser's Environmental Consultant, or another environmental firm designated by Purchaser which designation shall be with Seller's consent which shall not be unreasonably withheld ("Remediation Firm") to undertake such work, in a manner mutually agreed upon between Seller and Purchaser. Seller shall pay the reasonable cost of such work. All such work shall be performed in accordance with applicable Legal Requirements and will be performed in as prompt a manner as is reasonable and cost effective under the circumstances. Unless otherwise agreed to by Purchaser, the Closing shall not occur until completion of all such asbestos-containing remediation. Nothing herein shall require the removal or treatment of asbestos materials which are not regulated and/or required to be treated, removed, abated or remediated pursuant to applicable Legal Requirements.

Section 10.4 <u>Remedial Measures</u>.

(a)    If Remedial Measures (as described below) are required at a Property, Seller and Purchaser at the Closing shall execute and deliver a letter (the "Remedial Measures Agency Letter") to the appropriate environmental Governmental Entity ("Department") advising the Department that Seller, as the responsible party in connection with any remediation, designates Purchaser as its agent for purposes of overseeing the Remedial Measures. "Remedial Measures" shall consist of those activities, in Purchaser's reasonable opinion, which are required to investigate and/or assess and remediate petroleum and petroleum hydrocarbon conditions existing on or beneath, or migrating from or onto, the Properties in order to comply with all applicable Legal Requirements and all schedules, approvals and requirements of the Department and shall include any ongoing investigations and/or assessments, treatment or monitoring currently being conducted by Seller on any of the Properties ("Remedial Measures"). The Remedial Measures will be performed by Purchaser's Environmental Consultant. As agent/designee of Seller, Purchaser, in consultation with Seller, Purchaser's Environmental Consultant and the Department and subject to Section 10.5 below, shall

-36-

determine the manner, means and extent of performance of the Remedial Measures. Purchaser shall instruct Purchaser's Environmental Consultant to provide to Seller copies of all reports generated by Purchaser's Environmental Consultant for delivery to the Department.

(b)     Purchaser's Environmental Consultant shall forward all invoices directly to Purchaser who shall promptly forward a copy thereof to Seller.  Purchaser shall then, in a timely manner, pay all such invoices, subject to the provisions of 10.4(d) below.

(c)     Purchaser agrees to cause Purchaser's Environmental Consultant to make timely application for reimbursement of costs incurred in connection with the performance of the Remedial Measures to the extent reimbursable under applicable Legal Requirements.  All such applications for reimbursement will be made in the name of Seller, with Purchaser designated as (i) Seller's agent for purposes of providing additional information or responding to inquiries by the Department and (ii) recipient of all reimbursement funds from the Department.  Seller shall be responsible for the payment of any applicable deductibles.  In the event the Department, as part of its reimbursement program, disallows or determines that all or part of the expenses covered by a reimbursement request are unreasonable, or disallows a reimbursement request due to the failure to comply with statutory reimbursement requirements, Purchaser shall promptly notify Seller.  Seller shall, then have the right, at its expense, to appeal any such determination by the Department and Purchaser agrees to cooperate with Seller in connection with any such appeal; provided that Purchaser shall not be required to incur any unreasonable costs or expenses with respect thereto.  Seller agrees that Purchaser shall have no responsibility or liability for any amounts not reimbursed by the Department (or other Governmental Entity), unless (and then only to the extent that) Seller can demonstrate that, but for any gross negligence or willful misconduct on the part of Purchaser, the Department (or other Governmental Entity) would have made such reimbursements.

(d)     Beginning July 5, 1998 and on the fifth day of each subsequent calendar quarter, Purchaser shall send to Seller a report showing (i) all invoices paid by Purchaser in connection with the foregoing Remedial Measures and (ii) all reimbursements received from the Department, in each case during the immediately preceding quarter.  On or before July 20, 1998 and the 20th day of each subsequent calendar quarter (collectively, the "Objection Date"), Seller shall notify Purchaser with respect to any amounts contained in such report with which Seller disagrees.  To the extent that Seller fails to object prior to the respective Objection Date, the information in such report shall be deemed correct.  To the extent the report is deemed correct (as set forth above), or any amounts therein are undisputed, the parties expressly agree that Purchaser shall have the right to adjust and/or offset against the lease/rental and/or other payments otherwise owed to Seller (including, but not limited to, pursuant to the Promissory Note) beginning with the immediately subsequent month.  The parties will negotiate in good faith to resolve any disagreements with respect to any disputed amounts within fifteen (15) business days after the Objection Date.  If the parties are still unable to agree after such fifteen (15) business day period, the parties agree to appoint a mutually agreeable independent third party to determine the sole issue of the appropriate amount of payment/adjustment to be made. Notwithstanding anything herein to the contrary, if the aggregate amount of any offset would exceed $240,000 in any calender year, such offset shall be delayed until the first quarter of the next calender

year and shall accrue interest in the amount of 10% per year until paid or actually offset against the lease/rental or other payments otherwise owed to Seller as set forth above.

(e)    If, for any reason, the Department will not permit Purchaser to be Seller's agent, as described above, or otherwise to permit the arrangements described in this Section 10.4, Purchaser and Seller agree to (i) negotiate in good faith to achieve a mutually satisfactory arrangement consistent with the foregoing and/or (ii) execute such documents and take such other actions reasonably necessary to effect the arrangements set forth in this Section 10.4, as such may be modified pursuant hereto.

Section 10.5 Completion of Remedial Measures. Remedial Measures for a Property shall be deemed completed for purposes of this Agreement upon receipt by Purchaser from the Department or other appropriate governmental authority of a "No Further Action", "Closure" or similar written statement from the Department, stating that the Department will not require Seller (or Purchaser) to perform further Remedial Measures with respect to the Property ("Closure Letter"). Notwithstanding the foregoing, Remedial Measures shall not be deemed completed if Purchaser or Seller would be required to (i) file any notice/notification of any kind of record or otherwise or (ii) otherwise restrict the use of the Property in any way in order to obtain, or otherwise as a condition of obtaining, such Closure Letter. Receipt of the Closure Letter will not affect or diminish Seller's obligations under Article XI below.

Section 10.6 Limitations. Notwithstanding anything in this Article X to the contrary, if either (i) the estimated cost of the Remedial Measures or (ii) the estimated cost of any Damages which are reasonably likely to be incurred as a result of any claims of third Persons as a result of or related to the performance of the Remedial Measures or the release or existence of any Hazardous Materials at, on or migrating from any Property ("Claims") is reasonably likely to exceed $250,000 dollars for any one Property or $500,000 dollars in the aggregate for all Properties, Purchaser shall have the option, to either (i) terminate this Agreement as to (x) any one of the Properties for which the Remedial Measures or Claims would exceed $250,000 dollars or (y) those Properties for which the Remedial Measures or Claims would, in the aggregate, exceed $500,000 dollars and reduce the Purchase Price in accordance with the provisions of 3.2(c) or (ii) in the case of the Remedial Measures only, accept the affected Properties, reduce the Purchase Price by an amount reasonably necessary, in Purchaser's good faith opinion, to complete such Remedial Measures and place such amount in a fund dedicated for the payment of any expenses incurred in connection with the Remedial Measures at such affected Properties; provided that with respect to such fund established in connection with this Section 10.6, any amounts remaining after receipt of the Closure Letter with respect to any such affected Property shall be refunded to Seller. The creation of such fund shall not otherwise reduce or limit Seller's obligations in this Article X or Article XI or the Promissory Note. All dollar amounts set forth in this Section 10.6 are gross out-of-pocket expenses incurred or to be incurred, irrespective of any reimbursements from state programs received or to be received in connection therewith.

Section 10.7 Post-Closing Releases. If, at any time after Closing, during the performance of the Remedial Measures at a Property, Purchaser has reason to believe that a post-

-38-

closing release has occurred, Purchaser shall notify Seller immediately and take those steps reasonably required, in Purchaser's reasonable opinion, or as required by the Department, to determine and abate the source of the release. If, upon subsequent investigation by Seller and Purchaser, hydrocarbon contamination is determined to have occurred subsequent to the Closing, Seller and Purchaser shall agree on an allocation of responsibility for tests undertaken by Purchaser and for the remediation expenses from that date forward based on the degree to which the post-closing release increased the estimated overall remediation costs, with Purchaser and Seller to be responsible for their respective share of the costs and entitled to receive the reimbursement applicable to their respective share. Purchaser, through Purchaser's Environmental Consultant, shall continue to perform the Remedial Measures with respect to both the pre-closing and post-closing releases, if any, at the Property. Unless otherwise mandated by the Department, no post-closing release shall affect Seller's status as responsible party or Purchaser's status as agent/designee of Seller for purposes of performing the Remedial Measures with respect to any pre-closing release or effect or diminish Seller's obligations under Article XI below.

Section 10.8 Cooperation: Survival. Notwithstanding anything in this Section to the contrary, Purchaser and Seller agree (i) that it is extremely important for the parties to cooperate in good faith with each other in connection with any environmental matters, (ii) that, except where another time period is permitted or required hereunder, each party will provide the other with copies of final documents or other reports generated by Seller, Seller's Environmental Contractor, Purchaser or Purchaser's Environmental Consultant for delivery to the Department, or other notifications by or to the Department or any other Governmental Entities, as promptly as possible and (iii) the provisions of this Article X shall survive the Closing forever.

Section 10.9 Acknowledgment of Motor Fuels Equipment Regulation. Purchaser acknowledges (i) that the Assets include Motor Fuels Equipment, (ii) that the Motor Fuels Equipment has been used for the storage, transfer and sale of Motor Fuel Inventory and (iii) that the Motor Fuels Equipment is located within the State of Indiana and is subject to certain Legal Requirements governing the operation of underground storage tank systems. IN ACCORDANCE WITH SECTION 280.22(g) OF TITLE 40 OF THE CODE OF FEDERAL REGULATIONS, SECTION 329 IAC 9-2-2, Section 2 OF THE INDIANA ADMINISTRATIVE CODE, SELLER HEREBY NOTIFIES PURCHASER THAT THE UNDERGROUND STORAGE TANK(S) WHICH ARE INCLUDED IN THIS CONVEYANCE ARE PRESUMED TO BE REGULATED BY THE INDIANA ADMINISTRATIVE CODE AND THE U.S. ENVIRONMENTAL PROTECTION AGENCY AND MAY BE SUBJECT TO CERTAIN REGISTRATION AND NOTIFICATION REQUIREMENTS FOUND IN SECTION 329 IAC 9-2-2, Section 2 AND 40 CODE OF FEDERAL REGULATIONS, PART 280, RESPECTIVELY.

## ARTICLE XI

### Indemnification

Section 11.1 Survival of Representations and Warranties; Right to Indemnification Not Affected by Knowledge.

(a)     The representations, warranties, covenants and agreements of the parties hereto contained in this Agreement, the schedules attached hereto or in any Operative Document shall survive the Closing and the consummation of transactions contemplated hereby (and all examinations or investigations by or on behalf of any party prior to or after the Closing) and shall terminate upon the expiration of the applicable statute of limitations; provided, (i) the representations and warranties contained in Section 4.4 and Section 4.12 shall not terminate but shall continue indefinitely; and (ii) nothing in this Section 11.1 shall effect the term of (or any provisions of) any claims arising under any Operative Documents.

(b)     The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation the liability for indemnification being strict. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

Section 11.2 Indemnification by Seller. Seller agrees to defend, protect, indemnify and hold harmless Purchaser, its Affiliates, and each of its or their officers, directors, agents, employees and representatives (each such person and entity, and their successors and assigns, is referred herein as an "Purchaser Indemnitee") from and against any Damages arising out of or resulting from: (i) any inaccuracy in any representation or warranty made by Seller in this Agreement, or in any Operative Document or at the Closing (without giving effect to any supplemental disclosure provided during the Interim Period); (ii) the failure of Seller to perform or observe fully any covenant, agreement or provision to be performed or observed by it pursuant to this Agreement or any Operative Document; (iii) any actual or threatened claim, suit, action or proceeding arising out of or resulting from the conduct of the Stores Business on or prior to the Closing Date, which claim, suit, action or proceeding arises in connection with or relates to a specific act or event which occurred prior to the Closing; (iv) the failure by Seller to perform, pay, defend, discharge or otherwise be responsible for the Retained Liabilities; (v) any failure by Seller to comply with any bulk sales law applicable to the transactions contemplated by this Agreement; (vi) any civil penalties, fines or levies assessed by any Governmental Entity for Seller's failure to timely file, or for any inaccuracy contained in any filing or report made by Seller with such Governmental Entity, with respect to any period of time prior to the Closing; (vii) the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal, or

presence prior to the Closing of a Hazardous Material on, under, from or about any Property, (viii) the installation, operation and maintenance of the Motor Fuels Equipment prior to the Closing Date, including, but not limited to, compliance with Legal Requirements, or (ix) any Taxes arising out of the operation of the Stores Business prior to Closing, in each case regardless of when such claim, suit, action or proceeding is actually asserted. The remedies provided in this Section 11.2 shall not be exclusive of or limit any other remedies that may be available to any Purchaser Indemnitee.

Section 11.3 <u>Indemnification by Purchaser</u>. Purchaser hereby covenants and agrees to defend, protect, indemnify and hold harmless Seller, its Affiliates, and each of its or their directors, officers, employees, agents, and representatives (each such person and entity and their successors and assigns is referred to herein as an "Seller Indemnitee") from and against any and all Damages arising out of resulting from (i) any inaccuracy in any representation or warranty made by Purchaser in this Agreement or in any Operative Document (without giving effect to any supplemental disclosure provided during the Interim Period), (ii) the failure of Purchaser to perform fully any covenant, agreement or provision to be performed by it pursuant to this Agreement or any Operative Document, (iii) any actual or threatened claim, suit, action or proceeding arising out of or resulting from the conduct of Purchaser of the convenience store operations after the Closing Date, (iv) the failure of Purchaser to perform, pay, defend, discharge or otherwise be responsible for the Assumed Liabilities for periods arising after the Closing Date, (v) any civil penalties, fines or levies assessed against Seller by any Governmental Entity for Purchaser's failure to timely file, or for any inaccuracy contained in any filing or report made by Purchaser with such Governmental Entity, after the Closing; (vi) any Taxes arising out of the operation of the convenience stores after the Closing; or (vii) except as otherwise set forth in Article X, the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence by Purchaser after the Closing of a Hazardous Material on, under, from or about any Property, or (viii) the installation, operation and maintenance of the Motor Fuels Equipment, including, but not limited to compliance with Legal Requirements, after the Closing; in each case, except to the extent Seller is obligated to indemnify Purchaser for the same pursuant to Section 11.2 hereof. The remedies provided in this Section 11.2 shall not be exclusive of or limit any other remedies that may be available to any Seller Indemnitee.

Section 11.4 <u>Notification Process</u>.

(a)    If a claim by a third party is made against an Seller Indemnitee or Purchaser Indemnitee (collectively, the "Indemnitee"), and if the Indemnitee intends to seek indemnity with respect thereto under this Article XI, the Indemnitee shall promptly notify the other party ("Indemnitor") of such claim. The failure of an Indemnitee to promptly send a notice shall not relieve the Indemnitor from liability hereunder with respect to such claim except to the extent such failure results in insufficient time being available to permit the Indemnitor or its counsel to effectively defend against such claim and to make a timely response thereto, or otherwise prejudices the Indemnitor's ability to defend such claim. Indemnitor shall, in a timely manner, undertake, conduct and control, through counsel of its own choosing (subject to the consent of the Indemnitee, such consent not to be unreasonably withheld), and at its expense, the settlement or defense thereof, and the Indemnitee shall cooperate with the Indemnitor in connection therewith; provided that:

-41-

           (i)     Indemnitor shall not thereby permit to exist any Lien or other adverse charge upon any asset of the Indemnitee;

           (ii)    Indemnitor shall permit the Indemnitee to participate in such settlement or defense through counsel chosen by the Indemnitee, provided that the fees and expenses of such counsel shall be borne by the Indemnitee;

           (iii)   Indemnitor shall not settle any claim (1) unless the terms of such settlement provide for the full and effective release of the Indemnitee (without (a) the payment of funds by the Indemnitee, (b) the imposition of any burden or Lien on, or criminal or civil penalties, consent orders or decrees or admissions of guilt (or comparable plea) or wrongdoing or negligence required to be entered by or against, the Indemnitee or with respect to its assets or (c) any adverse change in Indemnitee's method of conducting its business), and (2) without the Indemnitee's consent (which consent shall not be unreasonably withheld), except that if consent is withheld solely on the basis of the amount of such proposed settlement, Indemnitor shall not be responsible for any Damages relating to such claim that exceed the amount of such proposed settlement; and

           (iv)   so long as Indemnitor is reasonably contesting any such claim in good faith, the Indemnitee shall not pay or settle any such claim.

           (b)    If Indemnitor does not notify the Indemnitee in a timely manner (but in no event later than ten (10) days after receipt of the Indemnitee's notice of a claim of indemnity hereunder) that Indemnitor elects to undertake the defense thereof, Indemnitee shall have the right to contest, settle or compromise the claim in the exercise of its exclusive discretion at the expense of Indemnitor. The Indemnitee shall, however, notify Indemnitor of any compromise or settlement of any such claim. Indemnitor shall promptly reimburse the Indemnitee for the Damages to which the Indemnitee is entitled by reason of this Article XI.

        Section 11.5 Indemnity Basket. Notwithstanding anything in this Agreement to the contrary, except as set forth below, Seller shall not be liable for Damages arising under Sections 11.2(i) and 11.2(ii) in this Agreement unless and until the aggregate amount of such Damages for which, but for this Section 11.5, Seller would be liable under this Agreement, exceeds $50,000 on a cumulative basis (the "Basket") and then only to the extent of any such excess; provided that if, by reason of this Agreement, Purchaser becomes entitled to Damages from Seller which (i) result from any individual claim, cause of action or demand or series of related transactions and (ii) exceed $20,000, such Damages shall be specifically excluded from the calculation of, and limitations imposed by, the Basket and, subject to any other provisions of this Agreement, shall be paid by Seller without regard to the Basket or any amounts applied towards the Basket.

        Section 11.6 Right of Set-Off. Upon notice to Seller specifying in reasonable detail the basis for such set-off, Purchaser may set off any amount to which it may be entitled under this Agreement against amounts otherwise payable under the Promissory Note and/or any outstanding

lease(s) between Seller and Purchaser. The exercise of such right of set-off by Purchaser in good faith, whether or not ultimately determined to be justified, will not constitute an event of default under the Promissory Note and/or such outstanding lease(s) between Seller and Purchaser. Neither the exercise of nor the failure to exercise such right of set-off will constitute an election of remedies or limit Purchaser in any manner in the enforcement of any other remedies that may be available to it.

## ARTICLE XII

### Miscellaneous

Section 12.1 Modification, Waiver. The rights and remedies of the parties are cumulative and not alternative. This Agreement may be modified, amended or supplemented in any manner and at any time only by a written instrument executed by the party affected thereby. No waiver by any party of any term or condition hereof, or the breach of any covenant, agreement, warranty, representation or provision contained herein, in any one or more instances, shall be made to be or construed as a further continuing waiver of any such term, condition or breach or a waiver of any other term, condition or breach.

Section 12.2 Expenses. Whether or not the transactions contemplated herein shall be consummated, each party shall (except as otherwise specifically provided herein) pay its own expenses incident to the preparation and performance of this Agreement, including counsel and financial advisers.

Section 12.3 Further Actions. Each party shall execute and deliver such other certificates, agreements, conveyances, certificates of title, and other documents and take such other actions as may reasonably be requested by the other party in order to consummate or implement the transactions contemplated by this Agreement.

Section 12.4 Waiver of Bulk Sales Act Compliance. Purchaser hereby waives compliance by Seller with the provisions of Article 6 of the Uniform Commercial Code of the State of Indiana.

Section 12.5 Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, or sent by telecopy, or sent by United States mail, first class, registered or certified, return receipt requested, with proper postage prepaid, in each case addressed as follows:

If to Seller:

By Hand Delivery or Mail:
MDK Corporation
415 New Street
P.O. Box 96
Goshen, Indiana 46529-0096

With a Copy To:
James Kolbus
//8 1st N. Main
Goshen, Indiana 46528

-43-

If to Purchaser:

By Hand Delivery or Mail
The Southland Corporation
2711 North Haskell Avenue
Dallas, Texas 75204-2906
Attention: Senior Vice President & General Counsel
Telecopy Numbers: 214/828-7119 or 214/828-7848

With a Copy To:
Michael J. Wall
Rothschild, Barry & Myers
55 West Monroe Street
Suite 3900
Chicago, Illinois 60603

or to such other address or to such other Person as any party hereto shall have last designated by notice given to the other party in accordance with this Section 12.5. Any notice given hereunder shall be deemed to have been given at the time of receipt thereof by the party to whom such notice is addressed; provided, any notice given by telecopy and received after the receiving party's normal business hours shall be deemed received by such party on the immediately succeeding business day.

Section 12.6 Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned, by operation of law or otherwise, by Seller without the prior written consent of the other party. Except as set forth in the preceding sentence, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto and their successors and permitted assigns, any rights, remedies or obligations under or by reason of this Agreement.

Section 12.7 Severability. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any material and adverse manner to either party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement to effect the original intent of the parties as closely as possible in an acceptable manner so that the transactions contemplated hereby are fulfilled to the extent possible.

Section 12.8 Publicity. Neither Seller nor Purchaser shall issue or make, or cause to have issued or made, any press release or announcement concerning the transactions contemplated

hereby without the advance approval in writing of by the other party, unless otherwise required by any Legal Requirement.

### Section 12.9 Disclosures

(a)     The disclosures in any schedule hereto, and those in any supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement.

(b)     In the event of any inconsistency between the statements in the body of this Agreement and those in any schedule hereto (other than an exception expressly set forth as such in such schedule with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

Section 12.10 Counterpart. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

Section 12.11 Headings: References. The article and section headings in this Agreement are for convenience of reference only and shall not be deemed to alter or affect the meaning or interpretation of any provisions hereof. Any reference herein to an article or section shall be deemed to refer to the applicable article or section of this Agreement unless otherwise stated herein. Any reference to a schedule shall be deemed to refer to the applicable schedule attached hereto, all of such schedules being incorporated herein by this reference.

Section 12.12 Governing Law. This Agreement shall be interpreted, construed and enforced, and all questions concerning compliance by any person with its terms shall be determined, in accordance with the laws of the State of Illinois, without giving effect to choice of law principles and any court of competent jurisdiction sitting in Cook County, Illinois shall have exclusive jurisdiction and venue over any dispute relating to or arising out of this Agreement or the performance or nonperformance of any obligation under this Agreement.

Section 12.13 Pronouns and Plurals. Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 12.14 Arms Length Transaction. This Agreement has been negotiated at arms length and each party has been represented by legal counsel. Accordingly, any or legal decision that would require interpretation of any ambiguities against the party drafting it, is not applicable and is hereby waived.

Section 12 15 Entire Agreement. This Agreement, and the schedules hereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and fully

supersede, and accordingly each party hereby disclaims and negates any and all statements, projections, understandings, agreements, covenants, representations and warranties between the parties made by any party or any respective officers, employees or representatives to any other party, or set forth in any document or writing delivered or made available to any party (as applicable) prior to the execution and delivery of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

SELLER:

MDK CORPORATION

By: _____

Name: Joseph J. Peters

Title: President

C & J REALTY L.P.

By: _____

Name: Joseph J. Peters

General Partner

-46-

PURCHASER:

THE SOUTHLAND CORPORATION

Attest:
By: _____

    Edward Harman
    Assistant Secretary

By _____
Name: Clark J. Matthews II
    President

I, Marvin Miller, hereby acknowledge the foregoing solely as it relates to my ownership interest in that certain Property located at US 20 East _____ and I agree that, solely with respect to such Property, I shall be deemed a "Seller" to the extent of my ownership interest in such Property.

_____
    Marvin Miller

-47-